THE RUBEROID COMPANY *v.* GLASSMAN CON-
STRUCTION COMPANY, INC., AND THE
HOME INDEMNITY COMPANY

[No. 627, September Term, 1966.]

98

*Decided November 20, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and FINAN, JJ.

*Allen A. Sperling* for appellant.

*Leonard S. Melrod,* with whom were *Joseph V. Gartlan, Jr., Guy-Michael B. Davis, Melrod, Redman & Gartlan* and *James J. Cromwell* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal involves questions of whether an unpaid supplier of materials to a public school construction project has

the protection of the payment bond of the general contractor and its surety and if so, whether the entire amount of the materials furnished are within such protection.

The basic facts are not in dispute. On June 18, 1963, Glassman Construction Co., Inc., (Glassman, general contractor or principal) contracted in writing with the Board of Education of Prince George's County, Maryland (owner), for the construction of the William Wirt Junior High School. In accordance with the provisions of Code, Article 90, section 11, Glassman, as principal, and The Home Indemnity Company, as surety, executed and delivered to the owner a labor and material payment bond which contained the following relevant provisions:

The condition was that:

> "if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; * * *."

> "A claimant is defined as one having a direct contract with the Principal or with a subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract, * * *."

On July 24, 1963, Glassman entered into a written subcontract for the resilient floor tile work on the school with James R. Miller, a sole proprietorship doing business as Miller Floor Company in Arlington, Virginia (Miller). This subcontract contained the following relevant provisions:

> "4. * * * At the Contractor's option payments may be made jointly to the Subcontractor and his suppliers.
> "13. In the event that the Contractor shall require a Performance and/or Payment Bond after this agreement has been executed, the Subcontractor shall furnish such bond in an amount, form, and with a company acceptable to the Contractor. Cost of the bond

under these circumstances only, will be borne by the Contractor.

"14. The Subcontractor agrees to hold the Contractor harmless from any claims or disputes, and will defend any law suit or dispute brought against the Contractor for any reasons whatsoever, which may arise due to any act of the Subcontractor.

"22. The Subcontractor shall not assign or transfer this contract or any part thereof or any interest therein, without the written consent of the Contractor.

"24. The Contractor reserves the right to withhold all or any part of partial payments, in addition to retained percentage withheld, until final completion, due the Subcontractor, for non-compliance with any of the terms of this Agreement, and shall be withheld until such time as said non-compliance has been corrected to the satisfaction of the Contractor.

"25. (a) If, at any time, there shall be asserted any lien or any other claim of any kind for which the Contractor or the said premises might become liable, and which is chargeable to the Subcontractor or his subcontractors, the Contractor shall have the right to retain out of any payment then due or thereafter to become due, an amount sufficient to completely discharge or pay any such lien or claim, including attorney's fees claimed by the lienor or other claimant, and to apply the amount thus retained for such discharge or payment. Any such application of sums due or to become due hereunder shall be taken and deemed to have been made in satisfaction of the Contractor's obligation for payment under this agreement. Should any such lien or claim be made or established after all payments are made, the Subcontractor shall refund and repay to the Contractor all monies that the latter may be compelled to pay in discharging or disposing thereof and of any other claim made in consequence of the Subcontractor's default, and this agreement shall not be affected by the final certificates or the final payment.

"27. The Subcontractor, at any time or times dur-

ing the course of this Agreement, upon the request of the Contractor, shall furnish the said Contractor evidence, in whatever form the Contractor may require, that all obligations of persons or firms performing work and/or supplying materials, equipment or services, or Social Security and Withholding Taxes, incurred by the Subcontractor under this Agreement have been met, paid, satisfied or discharged. Before commencing work, Subcontractor will furnish a complete list of his subcontractors and suppliers to the Contractor."

On March 26, 1964, prior to having performed any work on the school construction, Miller incorporated his business under the laws of the Commonwealth of Virginia, as Miller Floor Company, Inc. (Miller, Inc.). After this change in form, the business in all material respects continued as before, with Miller as manager and sole owner of Miller, Inc. Miller, however, after the incorporation of the business did no more work under the sole proprietorship form of doing business.

In July, 1964, the construction work on the school having reached the stage for the installation of the resilient tile floors, Miller, Inc. ordered from The Ruberoid Co., a manufacturer of resilient floor materials at its plant in Newburgh, New York (Ruberoid) certain flooring materials in the amount of $16,557.37. This order was placed by telephone and was later confirmed by a written purchase order which contained the heading "Miller Floor Company, Inc." and designated the ordered materials to be for the William Wirt Junior High School project.

Ruberoid had first sold materials to Miller in December, 1963, and at that time knew that Miller was an individual trading as Miller Floor Company. In July, 1964, Ruberoid became aware that its customer was then Miller, Inc. since the letterheads and purchase order then received were so marked and Ruberoid received a report from Dun & Bradstreet that its customer had incorporated.

Ruberoid shipped the ordered materials by common carrier to the job site where they were received and signed for by Miller, Inc. At no time were any of the materials in the possession of Glassman. Of the materials furnished by Ruberoid in the total

amount of $16,557.37, materials of the value of $8,009.25 were not used on the school construction, but without the knowledge of Ruberoid, Glassman or the surety, were diverted by Miller, Inc. to some other use unknown to them. It was stipulated that the diverted materials were either tiles of a color not specified on the job by the owner *or,* if of a specified color, exceeded the quantity of tiles required for the construction of the school.

Ruberoid, not having been paid for any of the flooring materials furnished by it, gave timely notice of non-payment in accordance with the statutory provision both to Glassman, as principal, and to the surety on the payment bond and, upon the refusal of payment, filed a timely action on the bond to recover from the principal and surety for the amount of the unpaid materials, plus interest from the due date of the bills for those materials.

The case was heard by the Circuit Court for Prince George's County (Bowie, J.) without a jury. After taking testimony and hearing arguments, the trial court entered judgment for the principal and surety, as defendants, for costs. A timely appeal was taken by Ruberoid to this Court.

The trial court was of the opinion that (1) since the principal Glassman had subcontracted the flooring work to Miller, a sole proprietorship, whereas Ruberoid furnished the materials to Miller, Inc., a corporation, the supplier did not supply the materials to a subcontractor as required by the applicable statute and was not a claimant as defined in the bond and hence, Ruberoid was not within the protection of the bond; and, (2) if Ruberoid was within the protection of the bond, the diversion of materials in the amount of $8,009.25 prevented that amount from being within the protection of the bond.

We disagree with both conclusions and will reverse the judgment of the lower court.

(1)

The pertinent portion of Article 90, section 11 calls for a payment bond "for the protection of all persons supplying labor and materials to the contractor or his subcontractor * * *." The bond actually executed and delivered defined a claimant as one having "a direct contract with the principal or with a subcontractor of the principal for labor, material, or both, * * *." We

think that appellant Ruberoid is within the protection of the bond, and thus we need not decide if its language is as broad as the pertinent portion of Article 90, section 11, and if not, if it must be so construed.

Liability on the bond turns on whether Miller, Inc., with whom Ruberoid had a direct contract, was a subcontractor of the principal Glassman. We think that it was.

On July 24, 1963, Glassman entered into a written subcontract with Miller, a sole proprietorship. On March 26, 1964, before any work was performed on the school site, Miller incorporated. After this change in form, Miller, Inc., with Miller as manager and sole owner, carried out the work under the subcontract, and Miller ceased to do any work as a sole proprietor. Given these facts, we agree with the lower court that there had been an equitable assignment of the subcontract as between Miller and Miller, Inc., even though Miller testified that he had made no *formal* assignment. See *Kretzer v. Lorshbaugh,* 117 Md. 562, 568, 83 A. 1027 (1912), where Pearce, J. quotes Judge Rambauer of St. Louis, author of *Assignments,* 4 Cyc. 46, saying:

> " 'Any words or *transaction(s)* which show an intention on one side to assign, and on the other to receive, * * *, will operate as an effective equitable assignment,' * * *." (Emphasis supplied).

The trial court held that the anti-assignment clause in the contract between Glassman and Miller, paragraph 22 quoted above, prevented an assignment *as to Glassman.* We, however, are of the opinion that Justice (now Chief Justice) Traynor was correct in *Trubowitch v. Riverbank Canning Co.,* 30 Cal. 2d 335, 344, 345, 182 P. 2d 182, 188 (1947), speaking for the Supreme Court of California, when he said:

> "[I]n the absence of language to the contrary in the contract, a provision against assignment does not govern claims for money due or claims for money damages for nonperformance [references to cases cited] ; that a covenant against assignment in a lease is not broken by changes in the firm of the lessee incident to the ad-

mission of a new partner or the withdrawal of an old partner or by the dissolution of a partnership and transfer of the rights under the lease with all other assets of the partnership to one of the partners [citing cases] ; that a provision against assignment in a contract or lease does not preclude a transfer of the rights thereunder by operation of law [citing cases] ; and *that if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract.* [citing cases]." (Emphasis supplied).

Glassman prohibited assignment without his consent so as to be assured that the work would be performed by a subcontractor he thought competent. This goal would not be defeated by recognizing the validity of the assignment between Miller and Miller, Inc., which was wholly owned and continued to be managed by Miller.

It might be thought that Glassman would be prejudiced, by recognizing the validity of the assignment as against him, because his potential liability under the payment bond would be increased if Miller, Inc. had fewer assets with which to pay suppliers than Miller the individual. It is true that if Glassman paid a supplier under the bond, Glassman, standing in the place of the supplier, could only look to the assets of Miller, Inc. However, the contract between Glassman and Miller, the obligations of which cannot be avoided by assignment (see 6 C.J.S. *Assignments,* sec. 112), provided that Miller would hold Glassman harmless for any claim that arose as a result of any act of the subcontractor or was chargeable to the subcontractor. See paragraphs 14 and 25(a) quoted above. Further, if Glassman had notice of Miller's incorporation, a payment bond could have been demanded under paragraph 13.

In short, we think that the assignment resulting from the incorporation of Miller did not affect the interests of Glassman and was thus valid in spite of the anti-assignment clause. Miller, Inc., therefore, became a subcontractor of the principal, and Ruberoid is a claimant having a direct contract with a subcontractor as defined by the bond.

## (2)

The trial court found that if Ruberoid was generally within the protection of the bond, the diversion of materials prevented the recovery of that amount under the bond. We disagree.

Article 90, section 11 requires a payment bond providing for the protection of all persons supplying labor and material to the contractor or his subcontractor "in the prosecution of the work provided for in the contract * * *." The bond protects those supplying material or labor "used or reasonably required for use in the performance of the contract, * * *." We think that the two phrases are substantially the same in effect and, although this precise point has not previously been decided by this Court, that a supplier who in good faith delivers the ordered materials to the site is to be protected. See *District Heights Apts. v. Noland Co.,* 202 Md. 43, 95 A. 2d 90, 39 A.L.R. 2d 387 (1953).

In this case all parties agree that the purchase order received by Ruberoid designated the materials as for the William Wirt Junior High School job and that Ruberoid shipped them by common carrier to the job site. We think that this evidence *prima facie* establishes Ruberoid's right to recover. As between a supplier and a general contractor, the latter is obviously in a better position to guard against any diversion of material after it has been delivered to the site. Indeed, it would be a great burden to the general contractor if every supplier maintained a representative on the job.

The general contractor may, of course, defeat a *prima facie* showing of good faith, but that has not been done here. Appellee points out that the order received by Ruberoid was for twice the amount of material that was actually required for the school site. It may well be that an excessive order could establish bad faith in some cases, but here the double order was not of such a grossly excessive amount as could be said to have put Ruberoid on notice that the materials were not for use on the job. Ruberoid argued, reasonably we think, that it would not be improbable for a school job to require twice the amount of flooring material as that actually used for the construction of the William Wirt School, and we see no valid reason to hold that a supplier must check the requirements of the contract of the general contractor. The general contractor is amply protected

106

by his ability to pick a responsible subcontractor, prevent any assignment that would adversely affect his interests, withhold payments until materialmen had been paid, and contract for the ability to demand a payment bond from the subcontractor (see paragraphs 22, 24 and 27, *supra*). See and compare the Maryland Mechanic's Lien Law, Article 63, section 1, and cases construing it annotated at 39 A.L.R.2d 399, 401, with the Article 90, section 11 payment bond which is required for the purpose of protecting materialmen on public projects where they have no lien on the work done. *Hughes & Co. v. Harry S. Mickey, Inc.,* 211 F. Supp. 298 (Md. 1962). See also and compare *United States v. Endebrock-White Co., Inc.,* 275 F. 2d 57 (4th Cir. 1960) ; *Glassell-Taylor Co. v. Magnolia Petroleum Co.,* 153 F. 2d 527 (5th Cir. 1946) ; *United States v. Dickstein,* 157 F. Supp. 126 (E. D. N. C. 1957) ; *United States v. Fire Association of Philadelphia,* 260 F. 2d 541 (2d Cir. 1958) ; *Commercial Standard Ins. Co. v. United States,* 213 F. 2d 106 (10 Cir. 1954) and other cases construing the Miller Act, 40 U.S.C.A. 270a, annotated at 79 A.L.R.2d 843.

> *Judgment of the lower court in favor of the defendants reversed and judgment entered in this Court for the Ruberoid Co., appellant, in the amount of $16,557.37 against Glassman Construction Co., Inc. and The Home Indemnity Company, appellees, with interest on the amount of the judgment entered in this Court from November 14, 1966, the costs to be paid by the appellees.*