578 A.2d 1184

CROWN OIL AND WAX COMPANY OF DELAWARE, INC.; et al.

v.

GLEN CONSTRUCTION COMPANY OF VIRGINIA, INC.

No. 104, Sept. Term, 1989.

Court of Appeals of Maryland.

Sept. 11, 1990.

C. Allen Foster (Steven D. Hedges, Patton, Boggs & Blow, Greensboro, N.C., and John A. Moag, Jr., Patton, Boggs & Blow, Baltimore), all on brief, for petitioners.

John Anthony Wolf (John F. Morkan, III, Ober, Kaler, Grimes & Shriver, Baltimore), all on brief, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

RODOWSKY, Judge.

"It is an ancient rule of the common law that a person who did not enter into a contract, or succeed to the interest of those who did, has no right of action for its breach, although he sustained damage thereby." *Levy v. Glens Falls Indem. Co.*, 210 Md. 265, 270, 123 A.2d 348, 351 (1956). In this case we examine the concept of a "successor" in the context of steps in the development of a parcel of unimproved, commercially zoned realty. The issue is whether, under a construction contract signed, as owner, by a corporation controlled by two individuals developing the property, the contractor is obliged to arbitrate claims on behalf of a limited partnership used by the same two individuals to syndicate the project.

On the south side of the intersection of Interstate Route 270 and Maryland Route 85 in Frederick County lies a 7.009 acre portion of a former farm. In February 1982 this portion was one of the assets owned by Crown Oil & Wax Company of Delaware, a Delaware corporation (Crown Inc.). An experienced real estate developer, Edward J. Joyeusaz, a/k/a Ed Joy (Joy), for some time had been interested in acquiring the parcel for development as a hotel. Crown Inc. had defaulted on a bank loan secured by

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, Sec. 3A, he also participated in the decision and the adoption of this opinion.

its stock. On February 28, 1982, Joy and his C.P.A., tax adviser and co-investor, Robert S. Understein (Understein), purchased from the bank 100% of the stock in Crown Inc. Joy, as "trustee," acquired 93.75% of the shares and 6.25% were acquired by R.U. Associates Limited Partnership, of which Understein was general partner.[1] Other assets of Crown Inc. at the time of its acquisition were three other parcels of land, seven gasoline stations and a tax loss carry forward in excess of $800,000. Joy testified that the plan was to develop the seven acre parcel through a partnership that would be syndicated through a private offering.

By letter dated January 9, 1984, and addressed to "Frederick Inn Limited Partnership," attention Joy, Quality Inns International, Inc. (Quality Inns) advised that the addressee's application for a Quality Inns franchise had been approved. Frederick Inn Limited Partnership did not exist of public record. An attorney in Understein's office had not yet prepared the papers for that partnership. Later, when the attempt was made to register a partnership in that name, the name was not available. The name Frederick Hotel Limited Partnership (FHLP) was then used. FHLP is at the center of the present controversy.

The franchise agreement with Quality Inns for the subject project was entered into April 9, 1984, by Crown Inc. A typewritten addendum to the printed franchise contract permitted, without payment of additional fees to the franchisor, transfer of that franchise to a partnership in which Joy's Park, Inc. and Jefferson Investments Limited Partnership (Jefferson) would be general partners. Joy's Park, Inc. was a wholly owned subsidiary of Ed Joy Real Estate,

---

1. The continuing complication in this litigation is that the documentation did not keep pace with events. Documents prepared in connection with the voluntary dissolution of Crown Inc. in late 1986 reflect that seventy-five percent of the total Crown Inc. shares were acquired by Joy, as trustee, with funds from Joy Family Limited Partnership and were ultimately titled in that limited partnership. Joy paid for 18.75% of the total shares with his own funds and those shares were ultimately titled in the name of Joy, individually.

Inc., which was owned or controlled by Joy. Understein was general partner of the limited partnership that was general partner of Jefferson. FHLP, as it was ultimately formally documented, satisfied this criterion for franchise transfer.

With the franchise in hand, Joy directed his attention to obtaining financing. On June 4, 1984, Citizens Savings & Loan Association, Inc. (Citizens) issued a commitment to Crown Inc. for a $1,155,000 loan secured by the seven acres and by the personal liability of Joy and Understein. That loan closed on June 13. Approximately $1 million of the loan proceeds were used for partial releases of mortgages on the parcel and the balance was used for preconstruction expenses of development.[2]

Bids from a number of general contractors were received by Joy in late June, and he selected Glen Construction Company of Virginia, Inc. (Glen), which he had used as general contractor for other projects. The final version of the written construction contract was not executed until more than a year later. Construction work, however, actually commenced in the field in August 1984.

All of the construction contract negotiations were conducted within the framework of contract documents, which included the American Institute of Architects (AIA) Document A201–1976, "General Conditions of the Contract for Construction."

Glen prepared the initial, proposed contract. It named Joy as owner. That offer was signed and transmitted by Glen to Joy on September 13, 1984.

Joy was also negotiating a construction loan with Citizens, which on October 5 committed to lend an additional $8,853,000. That commitment was addressed to Crown Inc., Frederick *Inn* Limited Partnership, Joy and Understein. It stated that "Frederick Inn Limited Partnership is the devel-

---

**2.** Understein did not testify. Joy's testimony suggests that these expenditures were accounted for as a loan by Crown Inc. to FHLP.

oper of the Project." The commitment required that "a firm construction contract" be entered into between the borrower and Glen prior to the first disbursement. Written acceptance of that commitment by Crown Inc. and by "Frederick Inn Limited Partnership," acting through Joy and Understein as its "general partners," was dated October 25, 1984.

A certificate of limited partnership—for FHLP—was approved by the State Department of Assessments and Taxation October 30, 1984. The general partners were Joy's Park, Inc. (7.5%) and Jefferson (2.5%). The limited partners were Joy (67.5%) and Understein (22.5%), each as a "Trustee." As described in the certificate, FHLP's business was "building, developing and operating" a Quality Inn on the seven acre site.

The construction loan agreement with Citizens was executed on November 28, 1984. The borrower was FHLP, which was again described as developer, although the agreement recited that Crown Inc. was the fee owner. FHLP was maker of the note evidencing the loan. Crown Inc., Joy and Understein guaranteed the loan.

The proposed contract, tendered on September 13, 1984, by Glen to Joy, was used to satisfy the loan commitment's requirement for a firm construction contract. Joy struck his name as owner and inserted Crown Inc. As president of Crown Inc., he signed that writing under date of October 16, 1984.

The commitment also required a security assignment to Citizens, approved by the contractor, of the rights to enforce the construction contract. In satisfaction of this requirement, Crown Inc., FHLP and Joy executed, also on November 28, an assignment of the construction contract. Glen, acting through its president, signed a written acknowledgment of the assignment at the foot of the assign-

ment.[3]

Glen and Joy continued to negotiate the construction contract. There were five additional versions drafted before the final version was fully executed on September 17, 1985. All of these versions name Crown Inc. as owner.[4]

While the final form of the written contract was evolving, Glen was building and being paid monthly draws. The draws for September 1984 through February 15, 1985, were paid by checks bearing the printed name or description, "Frederick Inn Construction." These payments totaled $1,058,104.90. Beginning with the payment of March 13, 1985, and continuing each month through the payment of September 20, 1985, the draws were by checks on which FHLP's name was printed. These totaled $2,332,535.10.

At some point after construction commenced Glen received evidence of the owner's coverage for "all risks" builder's insurance. The policy was issued for one year beginning July 1, 1984, and originally named "Crown Oil Wax" as owner. By endorsement No. 1, effective July 1, 1984, the named insured was corrected, at a time not stated in the record, to read: "Crown Oil & Wax Co., Inc. t/a Frederick Inn, Edward Joyeusaz, Robert Understein, A.T.I. M.A." A further endorsement, also of undisclosed date but effective July 1, 1984, added Glen as an additional insured.

Sometime in 1985 limited partnership interests in FHLP were sold by private placement.

By letter dated October 29, 1985, on the letterhead of Crown Inc. and signed by Joy, "President," notice was given to Glen terminating the construction contract seven days thereafter. In November 1985, on a date not specified in this record, Glen demanded arbitration with Crown Inc.

---

**3.** Whether this acknowledgement constituted an acceptance by Glen of changes made by Joy in Glen's offer and resulted in a written contract is not an issue that is before us.

**4.** Joy testified that he thought the contractor would want the fee owner of the property to sign as owner. The president of Glen denied that there was any such requirement.

By a document originally prepared for execution in 1984, but not signed until November 13, 1985, Crown Inc. and FHLP executed a letter of commitment for a ground lease of the hotel site from the former to the latter for a period of forty-eight years beginning July 1, 1984, on the terms outlined in that letter.

The shareholders of Crown Inc., by agreement dated November 15, 1986, formed Crown Oil & Wax Partnership (Crown Partnership) to which they contributed their shares in that corporation. This agreement named the beneficial owners for whom Joy and Understein had been holding the stock of Crown Inc. See n. 1, *supra.* The agreement also recited the partners' need for advice concerning impending changes in the income tax laws.

By a ground lease "made as of" the 1st day of July 1984 Crown Inc., the fee owner, leased the hotel site to FHLP for a term of six years beginning July 1, 1984, with the option in FHLP to extend for up to seven additional terms of six years each. This instrument was acknowledged by the parties before a notary public on December 9, 1986.

On December 2, 1986, Crown Partnership, as sole shareholder of Crown Inc., approved a plan of complete liquidation of Crown Inc., to be completed before the end of calendar 1986. On December 29, 1986, Crown Inc. deeded all of its realty, including the reversion underlying the ground lease, to Crown Partnership and assigned all of its nonrealty assets to Crown Partnership. Crown Inc.'s certificate of dissolution was filed in Delaware on December 30, 1986.

Crown Inc. had answered the demand for arbitration in late December 1985 by denying allegations of liability, and Crown Inc. had counterclaimed for an amount later to be determined.

Glen also sought a mechanics' lien. The answer to that petition was filed by Crown Inc., FHLP, Joy's Park, Inc. and Jefferson who had apparently been named by Glen as defendants. An affidavit by Joy in opposition to the me-

chanics' lien claim stated that the contract was entered into between Glen and Crown Inc. and referred to damages incurred by Crown Inc.

The action now before us was precipitated in June 1987 when Crown Inc. filed an amended answer and counterclaim in arbitration. The amendment averred that Crown Inc. answered and counterclaimed "on its own behalf, and on behalf of" FHLP. Thereupon Glen, on August 11, 1987, filed the instant complaint in the Circuit Court for Frederick County naming Crown Inc. and FHLP as defendants and seeking to restrain Crown Inc. and FHLP from pursuing in arbitration "any claim by or on behalf of FHLP." [5]

Glen acknowledges that it has agreed to arbitrate with Crown Inc. Its position is that FHLP is not a party to the construction contract, that Glen has not agreed to arbitrate with FHLP claims by FHLP, and that Glen has not agreed to arbitrate claims on behalf of FHLP asserted by Crown Inc. In the circuit court counsel for the defendants argued that claims by or on behalf of FHLP were arbitrable because FHLP was a third party beneficiary of the written construction contract between Glen and Crown Inc.

The circuit court concluded that FHLP was not a third party beneficiary of the construction contract. The court viewed as "most significant" the fact that FHLP was not named in the contract, and it saw as "particularly significant" that only Crown Inc. had counterclaimed for damages in the arbitration. The circuit court enjoined Crown Inc. and FHLP "from pursuing against Glen ... in any arbitra-

---

5. By the time the amended answer in arbitration was filed Crown Inc. had been dissolved. The judgment in the instant case orders that, upon the application of Crown Partnership and FHLP, Crown Partnership "is hereby GRANTED leave to be joined as a party in" the pending arbitration. No party to the appeal now before us questions that feature of the order.

All of the counsel refer to Crown Inc. as a party defendant in the present action, and we shall do the same. We note that a dissolved Delaware corporation continues in existence for the purpose of winding up its affairs. *See* Delaware Code Ann. tit. 8, § 278 (1983 Repl. Vol.).

tion proceeding, any claim by or on behalf of FHLP." Crown Inc. and FHLP appealed to the Court of Special Appeals.

In their brief to that court the appellants argued that the issue of damages recoverable by Crown Inc. was for the arbitrators, that FHLP could arbitrate with and obtain an award against Glen as a successor in interest to Crown Inc., and that FHLP was an intended third party beneficiary of the construction contract.[6]

The Court of Special Appeals affirmed in an unreported opinion. That court would not consider the appellants' successor in interest argument. The intermediate appellate court viewed the argument as an issue that had not been raised in or decided by the trial court and declined to exercise its discretion under Maryland Rule 8–131(a) to consider the "issue."[7]

We granted a petition for certiorari filed by Crown Inc. and FHLP. That petition and our writ included among the questions presented the successor in interest argument.

The general conditions of the construction contract contain a broad arbitration agreement and a provision relating

---

6. Counsel who appear for the petitioners in this Court and who appeared for them in the Court of Special Appeals are not the same counsel who represented those parties in the circuit court. Trial counsel in the circuit court were not the same counsel responsible for the preparation of legal documents for the project, some of which were prepared by counsel in Montgomery County who had some connection with Understein and some of which were prepared by counsel in Frederick County who were engaged on a task by task basis.

7. Maryland Rule 8–131(a) reads:

"(a) *Generally.*—The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

to successors and assigns. The former, in relevant part, reads:

"7.9 ARBITRATION

7.9.1 All claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof ... shall be decided by arbitration ... unless the parties mutually agree otherwise."

Paragraph 7.2.1, dealing with "SUCCESSORS AND AS- SIGNS," reads in relevant part:

"The Owner and the Contractor each binds himself, his partners, successors, assigns and legal representatives to the other party hereto and to the partners, successors, assigns and legal representatives of such other party in respect to all covenants, agreements and obligations con- tained in the Contract Documents."

■ The foundation of Glen's action is the Maryland Uniform Arbitration Act (the Act), Md.Code (1974, 1989 Repl.Vol.), §§ 3–201 through 3–234 of the Courts and Judi- cial Proceedings Article (CJ). Section 3–206 provides that an agreement to arbitrate future disputes "is valid and enforceable, and is irrevocable...." "If the court deter- mines that the agreement exists it shall order arbitration." § 3–207(c). Likewise, § 3–208 allows a party that denies the existence of any arbitration agreement to seek a stay of the arbitration proceeding.

"If the court determines that existence of the arbitration agreement is in substantial and bona fide dispute, it shall try this issue promptly and order a stay if it finds for the petitioner. If the court finds for the adverse party, it shall order the parties to proceed with arbitration."

§ 3–208(c).

Thus, under §§ 3–207 and 3–208 the sole question before the court is whether there exists an agreement to arbitrate. Section 3–210 prohibits the court from inquiring into the merits of a claim:

"An order for arbitration shall not be refused or an arbitration proceeding stayed:

(1) On the ground that the claim in issue lacks merit or bona fides; or

(2) Because a valid basis for the claim sought to be arbitrated has not been shown."

Maryland courts have consistently stated that the Act embodies a legislative policy favoring the enforcement of executory agreements to arbitrate. *See Anne Arundel County v. Fraternal Order of Anne Arundel Detention Officers and Personnel*, 313 Md. 98, 105, 543 A.2d 841, 845 (1988); *Gold Coast Mall v. Larmar Corp.*, 298 Md. 96, 103, 468 A.2d 91, 95 (1983); *Charles J. Frank, Inc. v. Associated Jewish Charities*, 294 Md. 443, 448, 450 A.2d 1304, 1306 (1982); *Aetna Casualty & Sur. Co. v. Insurance Comm'r*, 293 Md. 409, 421, 445 A.2d 14, 19 (1982); *Maietta v. Greenfield*, 267 Md. 287, 291, 297 A.2d 244, 246 (1972); *Rosecroft Trotting & Pacing Ass'n v. Electronic Race Patrol, Inc.*, 69 Md.App. 405, 408, 518 A.2d 137, 139 (1986); *Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc.*, 21 Md.App. 307, 320, 320 A.2d 558, 565 (1974), *modified*, 274 Md. 307, 334 A.2d 526 (1975).

■ The intention of the parties controls on whether there is an agreement to arbitrate. *See Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.*, 313 Md. 652, 658, 547 A.2d 1048, 1051 (1988). But, where the parties use a broad, all encompassing clause, it is presumed they intended all matters to be arbitrated. *NSC Contractors, Inc. v. Borders*, 317 Md. 394, 403, 564 A.2d 408, 412 (1989); *Gold Coast*, 298 Md. at 104, 468 A.2d at 95.

In *Frederick Contractors, Inc. v. Bel Pre Medical Center, Inc.*, 274 Md. 307, 315, 334 A.2d 526, 531 (1975), this Court held that "the timeliness of a demand for arbitration is a threshold question, which is, in the first instance, for the courts. . . ." *Board of Educ. of Charles County v. Education Ass'n*, 286 Md. 358, 408 A.2d 89 (1979), held that "a court, not an arbitrator, makes the final determination of

the legality of a contract before an arbitration award is enforced." *Id.* at 366, 408 A.2d at 93. *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.*, 313 Md. 652, 547 A.2d 1048, addressed "the proper standard of review when a party to an arbitration proceeding moves to vacate the ... award, claiming ... the parties never agreed to arbitrate...." *Id.* at 654, 547 A.2d at 1049. We held that the determination of whether an agreement to arbitrate had ever been formed is an issue for the court. No weight was given to the arbitrators' determination that they had jurisdiction; rather, we held that a court should conduct a de novo review of that issue. *Id.* at 664, 547 A.2d at 1053–54.

Our decision in *Gold Coast, supra,* laid down the rules for determining whether court or arbitrator determines arbitrability where the arbitrability issue is the scope of the arbitration clause and its applicability to the dispute at hand. *Gold Coast* involved "a dispute concerning the payment of rent, arising under a lease agreement containing an arbitration clause...." 298 Md. at 99, 468 A.2d at 93. One lease provision required arbitration of all disputes. Two other provisions, however, appeared to provide the landlord with remedies other than arbitration. This Court began by noting that "[a] party cannot be required to submit any dispute to arbitration that it has not agreed to submit." *Id.* at 103, 468 A.2d at 95.

We further said that:

"[i]n accord with this legislative policy [favoring enforcement of arbitration agreements], the Act strictly confines the function of the court in suits to compel [or stay] arbitration to the resolution of a single issue—is there an agreement to arbitrate the subject matter of a particular dispute."

*Id.* at 103–04, 468 A.2d at 95.

After canvassing the case law throughout the country, Judge Davidson, writing for this Court, concluded that there were three classifications of disputes over the scope of an arbitration clause. First, where the language of the

arbitration clause is clear, and the dispute in question falls clearly within the provision. Second, where it is clear that "the issue sought to be arbitrated lies beyond the scope of the arbitration clause...." In these two situations the court decides the issue of arbitrability and compels or stays arbitration accordingly. *Id.* at 104, 468 A.2d at 95. In the third class of disputes, "the language ... is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement." *Id.* at 105, 468 A.2d at 96. As a general rule, "[w]here there is a broad arbitration clause, calling for the arbitration of any and all disputes arising out of the contract, all issues are arbitrable unless expressly and specifically excluded." *Id.* at 104, 468 A.2d at 95. Thus, in this third class, the Court should promote the legislative policy favoring arbitration and leave the issue of arbitrability to the arbitrators.

In the instant action Glen argues that this case is like *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.* and that it is for the court to decide if there is any contract between Glen and FHLP to arbitrate disputes. Crown Inc. says this case is like *Gold Coast* in that Glen has agreed to arbitrate with Crown Inc. but is attempting to have the court invade the province of the arbitrators by excluding potential items of damage if claimed by or through Crown Inc. These contentions concern that portion of the injunction which prohibits Crown Inc. from asserting any claim on behalf of FHLP. We need not decide those contentions if Glen has agreed to arbitrate with FHLP. We, therefore, turn to whether we may consider FHLP's successor in interest argument and, if so, its application here.

I

Glen submits that FHLP's contention that it is a successor to Crown Inc. is an "issue" which was not raised in or decided by the trial court and cannot be considered by us because of Rule 8–131(a). *See* n. 7, *supra.* Whether FHLP could directly claim in arbitration against Glen has

been an issue in this action from its inception. Glen joined FHLP as a party to this action, even though FHLP was not a named party in the arbitration and had not sought to be added directly as a party. Glen sought, and obtained, an injunction restraining FHLP from pursuing in arbitration any claim in its own name. The third party beneficiary theory advanced by FHLP in the circuit court is basically an argument supporting arbitration by FHLP with Glen.

Although FHLP did not argue the successor theory until the case was briefed for the Court of Special Appeals, the theory does not present a new issue, but it is an additional argument for direct arbitration between FHLP and Glen. *See Mandel v. O'Hara*, 320 Md. 103, 576 A.2d 766 (1990) (issue of gubernatorial immunity for common law tort decided on argument, first advanced on appeal, that exercise of veto is a legislative function, although trial court argument rested on analogy to immunity of President of the United States); *Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 559 A.2d 365 (1989) (issue of discharge of guarantor decided on doctrine of subrogation, although not argued).

Even if the successor argument were a new issue, raised for the first time on appeal, this Court has discretion under Rule 8–131(a) to consider it, and we exercise that discretion to consider the "issue" in this case. Inasmuch as Rule 8–131 "employs the term 'ordinarily,' it permits exceptions and we have occasionally decided cases on issues not previously raised." *Taub v. State*, 296 Md. 439, 441, 463 A.2d 819, 820 (1983). *Taub* was a prosecution under the animal cruelty statute that resulted in convictions in the District Court and on de novo appeal in circuit court. The issues raised in those courts concerned the constitutionality of the statute and whether it had been preempted by federal law. In addition, claimed errors in evidentiary rulings had been preserved for appellate review. In our certiorari review we decided the case on a new issue, raised for the first time at oral argument to this Court, namely, whether the Maryland criminal statute applied to scientific research pursuant to a

federal program. Decision of that issue was "completely dispositive of the case." *Id.* at 442, 463 A.2d at 820.

■ Nor is any exercise of discretion on this Court's part negated by the determination of the Court of Special Appeals that it would not consider the "issue," even though expressly urged to do so. This Court may exercise discretion independently under those circumstances. We need not first conclude that there was an abuse of discretion by the Court of Special Appeals. *See Squire v. State,* 280 Md. 132, 368 A.2d 1019 (1977).

In *Squire* this Court had granted certiorari on the question of whether the Court of Special Appeals had abused its discretion in failing to take cognizance of plain error in a jury instruction to which no exception had been taken. We concluded that it was "unnecessary for us to consider that precise issue since we have concluded (in the exercise of our independent discretion derived from [former] Rule 756g) that this Court should recognize the existence of the error ... and reverse the judgment." *Id.* at 134, 368 A.2d at 1020. Former Rule 756(g) was a specific application to jury instructions in criminal cases of the general rule that "this Court will not consider claims of error which have not been presented and decided by the trial court." 280 Md. at 134, 368 A.2d at 1020.

■ We exercise our discretion to decide the "issue" because it is desirable "to avoid the expense and delay of another appeal." *See* Md. Rule 8–131(a). As the instant case has come to us there is, very properly, no evidentiary flesh on the skeleton of the claims, and the claims themselves are unspecified and wholly abstract. Were the case sent to arbitration in the format sought by Glen, Glen theoretically could urge as to each specific item of claimed damages that there was no liability on its part at all and, if any there be, that liability is only to FHLP and beyond the award powers of the arbitrators. Thus, any award in favor of Crown Inc. would invite an action by Glen in court to set aside the award on the ground that the underlying claim

was one by or on behalf of FHLP. If, because FHLP is the successor to Crown Inc., Glen has agreed to arbitrate with both, then the grossly inefficient, multiple procedures here-inabove outlined can be avoided. Further, Glen has had the opportunity, of which it availed itself, to brief and argue against the successor theory at the appellate level.

## II

By ¶ 7.2.1 of the general conditions of the construction contract, Glen bound itself to the owner, and to the succes-sors of the owner, "in respect to" all covenants in the contract. The covenants include the agreement to arbi-trate. FHLP is a successor of Crown Inc. within the meaning of the construction contract, so that Glen has agreed to arbitrate with FHLP.

"Successor" is not defined in the contract. The word has: "many legal applications and [ ] it is therefore difficult to define precisely. Recognizing this difficulty, Mr. Justice Marshall once remarked, 'There is, and can be, no single definition of "successor" which is applicable in every legal context.' *Howard Johnson Co. v. Hotel Employ-ees*, 417 U.S. 249, 263 n. 9, 94 S.Ct. 2236, 2243 [n. 9], 41 L.Ed.2d 46 (1974).... To determine the meaning of 'successor' in the area of labor law, Mr. Justice Marshall appears to endorse a case-by-case approach with emphasis on the facts of each case. 417 U.S. at 256, 262–63 n. 9, 94 S.Ct. [at 2240, 2243–44 n. 9]. The same fact-oriented approach has also been employed by courts in defining the limits of purely contractual successorship....

"In the non-labor contractual cases, 'successor' has often been defined as 'one who takes the place that another has left, and sustains the like part or character.' *Wawak Co. v. Kaiser*, 90 F.2d 694, 697 (7th Cir.1937); *Citizens Suburban Co. v. Rosemont Development Co.*, 244 Cal.App.2d 666, 676, 53 Cal.Rptr. 551, 557 (1966); *Van Deusen v. Ruth*, 343 Mo. [1096,] 1103, 125 S.W.2d [1,] 4 [ (1938) ]; *Thompson v. North Texas National Bank*, 37 S.W.2d [735,] 739 [ (Tex.Com.App.1931) ];

Black's Law Dictionary 1600 (rev. 4th ed. 1968). The definition goes beyond the borders of contract assignment and is used so as to obviate the need for express assumption of burdens. *Citizens Suburban Co. v. Rosemont Development Co.*, 244 Cal.App.2d at 676, 53 Cal. Rptr. at 557."

*Safer v. Perper*, 569 F.2d 87, 95 (D.C.Cir.1977) (footnote and citations omitted).

■ In the case before us Crown Inc. at least equitably assigned its benefits under the construction contract to FHLP and FHLP assumed the obligations of Crown Inc. under the contract. " ' "Any words or *transaction(s)* which show an intention on one side to assign, and on the other to receive, * * *, will operate as an effective equitable assignment," * * *.' (Emphasis supplied)." *Ruberoid Co. v. Glassman Constr. Co.*, 248 Md. 97, 103, 234 A.2d 875, 878 (1967). Purportedly, as of July 1, 1984, and certainly by December 9, 1986, when the ground lease was acknowledged, Crown Inc. leased the hotel site to FHLP. By the latter date, FHLP had been syndicated. That lease in part provides:

"FIFTH: Lessee is leasing the Land pursuant to this Lease for the purpose of constructing the hotel complex and retail/office complex, that is, for the purpose of building, owning and operating (i) a 170–room Quality Inn Hotel complex ... and (ii) a 47,000 square foot, more or less, retail/office rental facility.... The development of the Project, and its construction, ownership and operation shall be at the sole cost and expense of Lessee; and in connection therewith, Lessee does hereby indemnify and hold the Lessor harmless from any and all claims, causes of action, bills, reckonings, accounts and/or liabilities of any nature ... arising out of the construction, ownership or operation of the Project."

The construction loan agreement under which FHLP is primarily liable to Citizens, as between FHLP, Crown Inc., Joy and Understein, is consistent with the structuring of the transaction as described in the ground lease. Based on

the entire transaction there is also an equitable assignment of the franchise agreement with Quality Inns from Crown Inc. to FHLP. If the language of the ground lease is not an express assumption by FHLP of Crown Inc.'s obligations as owner under the construction contract, the entire transaction compels the finding that there was an implied assumption. *See Automatic Retailers of America, Inc. v. Evans Cigarette Service Co.,* 269 Md. 101, 304 A.2d 581 (1973); *R.E.C. Management Corp. v. Bakst Service, Inc.,* 265 Md. 238, 289 A.2d 285 (1972).

■ The obligations on Crown Inc., as owner, under the construction contract primarily involve the payment of money to Glen. "[T]here is nothing personal about the act of payment." 4 Corbin on Contracts § 864, at 429 (1951). Thus, nothing in the nature of the performance to be rendered by Crown Inc., as owner, prevents it from transferring the benefits, or delegating the duties, of owner.

The Glen–Crown Inc. construction contract in ¶ 7.2.1 provides that "[n]either party to the Contract shall assign the Contract ... without the written consent of the other[.]" *Ruberoid Co. v. Glassman Constr. Co.,* 248 Md. 97, 234 A.2d 875, addressed the effect of a similar provision binding a subcontractor. At the time the subcontract was formed the subcontractor was a sole proprietor. Thereafter the business was incorporated, the sole proprietor became sole stockholder of the new corporation, and he continued to manage the business. In ruling on a claim against the surety on the general contractor's payment bond, asserted by a material supplier of the new corporation, we held that the new corporation was a subcontractor because the incorporation did not adversely affect the interests of the general contractor. The assignment resulting from that incorporation was valid in spite of the anti-assignment clause. Quoting from Chief Justice Traynor's opinion for the court in *Trubowitch v. Riverbank Canning Co.,* 30 Cal.2d 335, 344–45, 182 P.2d 182, 188 (1947), we said that: " '[I]f an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon wheth-

er it affects the interests of the parties protected by the nonassignability of the contract.' " 248 Md. at 104, 234 A.2d at 879 (emphasis in original omitted).

In the instant matter the ownership of the hotel business changed. Although that change is more than a matter of form, there is clearly no detriment to Glen. The obligations that Crown Inc. had, and has, as owner under the construction contract cannot be avoided by assignment. *See Ruber-oid Co.*, 248 Md. at 104, 234 A.2d at 879. There is no contention that Glen consented to a novation whereby the assumption by FHLP of obligations imposed on the owner under the construction contract relieved Crown Inc. of its obligations to Glen. The assets with which Crown Inc. backed up its promises under the construction contract are still available to Glen for satisfaction of any award on its claim of breach of contract. This is because the hotel assets assigned to FHLP can be reached by Glen, by virtue of FHLP's assumption of Crown Inc.'s duties as owner under the construction contract.

Moreover, there appears to have been no change in management on the owner's side of the contract prior to contract termination. Joy apparently served as the owner's representative both for Crown Inc. and for FHLP in dealing with Glen. Further, the assumption by FHLP also made any assets, additional to the hotel assets, held by Joy's Park, Inc. and by Jefferson, the general partners of FHLP, available for satisfaction of an award and judgment in favor of Glen against FHLP. Finally, Glen's acknowledgement of the security assignment of the construction contract by Crown Inc., by Joy, and by FHLP indicates that Glen perceived no prejudice in FHLP's having some interest in the benefits of the construction contract. Primarily, Glen was looking to the construction loan advances for payment.

■ At the hearing in the circuit court, counsel for Crown Inc. and FHLP stipulated that there was no assignment of the construction contract to FHLP and, according-ly, no consent by Glen. We interpret the stipulation to

mean that no formal assignment was prepared, much less executed by assignor and assignee, or consented to by Glen. This Court, however, is not bound by stipulations on matters of law. As a matter of law the facts establish an equitable assignment of the construction contract owner's rights to, and an assumption of the owner's obligations by, FHLP.

We recognize that Joy signed the final version of the construction contract in the name of Crown Inc. almost one year after FHLP had been formed, that Joy, describing himself as President of Crown Inc., gave notice of contract termination, and that the counterclaim in arbitration was initially asserted by Crown Inc. These facts, however, do not furnish sufficient evidence to support the conclusion that Crown Inc., as between it and FHLP, had the right to recover damages for breach of the construction contract and to retain those damages for its own account. As between Crown Inc. and FHLP, the latter was primarily obligated to pay for the construction. FHLP was syndicated with outside investors. For Joy and Understein to attempt to retain in Crown Inc., in which they were the principals, the damages for any breach of contract by Glen, while requiring outside investors in FHLP to pay for the construction, would work a fraud on the outside investors. That conclusion requires clear and convincing evidence. Here, there are other plausible and innocent inferences. The more likely, and therefore required, interpretations of the evidence are either that Crown Inc. acted as an agent for a limited partnership to be formed in signing the construction contract as owner and in undertaking to enforce it, or that the equitable assignment was effected late in the transaction, perhaps as late as December 1986 when the ground lease was notarized.

For purposes of the instant appeal we need not pinpoint when the equitable assignment by Crown Inc. of the hotel project, including the construction contract, and the assumption by FHLP of that contract legally took effect

between those parties. Our concern here is with arbitrability, particularly of claims by FHLP against Glen. Unlike the third party beneficiary theory, the successor theory does not focus on the time of formation of the construction contract. It is sufficient that FHLP has become the successor of Crown Inc. and that a claim in arbitration for the benefit of FHLP has been asserted.

*Safer v. Perper*, 569 F.2d 87, supports the conclusion that FHLP is a successor. The facts in that case took place over three years. A joint venture, which owned a piece of property, agreed to build on it and lease the building to a partnership, Chevy Chase. The joint venture then conveyed the property to a corporation, Winthrop, to which the lease was assigned. Winthrop executed a deed of trust back to the joint venture and then conveyed to one Copeland. The contractor commenced construction based on a letter from the joint venture. Winthrop entered into a construction contract with the same contractor, with Copeland acting as guarantor. During Copeland's ownership Chevy Chase obtained occupancy of the new building, but the deed of trust by Winthrop was foreclosed, and the property was sold. The purchaser at foreclosure assigned all of its interest to Somerset Properties Limited Partnership (Somerset). Somerset, the purchaser at foreclosure, and the trustees of the deed of trust joined in a deed to an insurance company which leased back to Somerset. Somerset satisfied a lien on the property imposed by the contractor. Disputes then developed, and one issue was whether Somerset could claim on the construction contract.

The *Safer v. Perper* court, undertaking to apply Maryland law, held that Somerset was the successor of the originally contracting owner, Winthrop, and could sue as owner on the construction contract. The court placed considerable emphasis on the fact that Somerset had taken Winthrop's place in the transaction by paying the contractor. In the case before us, FHLP took Crown Inc.'s place by agreeing that the construction costs would be its sole responsibility. Indeed, some $2,300,000 of progress pay-

ments in the months leading up to termination of the construction contract were made by checks on which FHLP was drawer. We need not place our imprimatur on the full reach of *Safer* because the instant case is a stronger one than *Safer* for application of the successor concept. Here there is also continuity in management for the owner of the hotel project and some continuity of equitable ownership in the succession from Crown Inc. to FHLP.

We are also satisfied that "successor" as used in the instant construction contract embraces a syndicated limited partnership for development of the project. The events in this case took place prior to the effective date of provisions of the Tax Reform Act of 1986. At the time of the events it could be said that "[l]imited partnerships have been a favored form for real estate investments because taxable profits and losses are passed through to the individual investor, who can claim tax deductions for depreciation and interest expense not limited to the amount of cash distributions received from the partnership." D. Schwartz, *Overview of Different Types of Investment Vehicles*, in *Real Estate Syndications, 1986, Current Techniques and Investment Vehicles* (Vol. 2), 278 Pract.Law Inst. 11, 13 (1986). Glen and its affiliates, which enjoy the ninetieth largest volume among construction contractors in the United States, and Joy, an experienced developer, would not have intended so to restrict "successor" that a common investment vehicle and source of business for builders would be precluded.

For the foregoing reasons we conclude that the language of the broad arbitration clause is clear as applied to the facts of this case. Arbitrability is an issue for the court either under the *Messersmith* or *Gold Coast* tests. Claims by FHLP against Glen are arbitrable.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR FREDER-

ICK COUNTY AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR FREDERICK COUNTY WITH INSTRUCTIONS TO DELETE PARAGRAPH (1) OF THE ORDER OF OCTOBER 27, 1987. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY GLEN CONSTRUCTION COMPANY OF VIRGINIA, INC.