**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

INDUSTRIAL ENTERPRISES,
INCORPORATED, a Maryland
Corporation,

*Plaintiff-Appellee,*

v.

PENN AMERICA INSURANCE
COMPANY, a Pennsylvania
Corporation,

*Defendant-Appellant.*

No. 09-2346

COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION,

*Amicus Supporting Appellant.*

INDUSTRIAL ENTERPRISES,
INCORPORATED, a Maryland
Corporation,

*Plaintiff-Appellant,*

v.

PENN AMERICA INSURANCE
COMPANY, a Pennsylvania
Corporation,

*Defendant-Appellee.*

COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION,

*Amicus Supporting Appellee.*

No. 09-2397

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:07-cv-02239-RDB)

Argued: December 7, 2010

Decided: March 18, 2011

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Duncan joined. Judge King wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Thomas S. Schaufelberger, SAUL EWING, LLP, Washington, D.C., for Penn America Insurance Company. John William Schryber, DICKSTEIN SHAPIRO, LLP, Washington, D.C., for Industrial Enterprises, Incorporated. **ON BRIEF:** Paul A. Fitzsimmons, SAUL EWING, LLP, Washington, D.C., for Penn America Insurance Company. Russell V. Randle, Kristen M. Jarvis Johnson, PATTON BOGGS LLP, Washington, D.C., for Industrial Enterprises, Incorporated. Laura A. Foggan, Gregory J. Langlois, WILEY REIN LLP, Washington, D.C., for Complex Insurance Claims Litigation Association, Amicus Curiae.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this appeal, we decide whether a standard comprehensive general liability insurance policy ("CGL policy"), which indemnifies the insured for "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage," covers the insured's liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for costs to remediate the presence of hazardous substances on the insured's land.

On July 9, 1999, the U.S. Environmental Protection Agency ("EPA") sent Industrial Enterprises, Inc., and other owners of neighboring properties near the Back River in Baltimore County, Maryland, letters expressing the EPA's intent to include Industrial Enterprises' property and neighboring properties in a Superfund Site designated for cleanup under CERCLA due to the presence of hazardous substances on the Site. The EPA also advised Industrial Enterprises and the other property owners that they might be required to under-

take or fund investigatory and cleanup actions to protect the public health, welfare, and the environment.

Industrial Enterprises forwarded the EPA letter to its insurer, Penn America Insurance Company, requesting that it provide a defense. When Penn America denied coverage, Industrial Enterprises commenced this action for a judgment declaring that Penn America was obligated to pay Industrial Enterprises the sums that it had incurred and reasonably would incur as defense costs in response to the demands made by the EPA. It also demanded reimbursement of defense costs in an amount not less than $600,000.

On the motions of the parties for summary judgment, the district court found a "potentiality" of insurance coverage, requiring Penn America to provide a defense, and accordingly it awarded Industrial Enterprises $465,774.50 for attorneys fees incurred, $89,070 in technical consulting fees incurred, and 6% interest on the sum of those amounts, all reduced by the $210,000 that Industrial Enterprises received in a settlement with the other property owners. The district court also denied Industrial Enterprises' claim for $750,000, which it paid in reaching a settlement and forming a defense coalition with the other neighboring property owners.

On appeal, we reverse. Based on the decision of *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 625 A.2d 1021 (Md. 1993), where the Maryland Court of Appeals held that a similar CGL policy did not cover expenses incurred in response to the State's regulatory order to remove soil containing hazardous chemicals, we conclude that Industrial Enterprises' liability under CERCLA is not liability for "property damage," but rather regulatory liability for response costs. Accordingly, we conclude that Penn America's CGL policy does not cover Industrial Enterprises' regulatory liability and, therefore, Penn America has no duty to provide Industrial Enterprises with a defense.

## I

During the relevant periods, Industrial Enterprises owned numerous parcels of land located in Baltimore City and Baltimore County, Maryland, portions of which had been used as landfills from the 1940s through the 1970s. The landfills were located in low-lying areas that were previously wetlands, and Herring Run and Moore's Run flow through the areas and feed into the Back River at the land's eastern boundary.

In January 1999, the EPA issued a proposal to include Industrial Enterprises' property, as well as neighboring properties, in a Superfund Site for cleanup. As part of its process, the EPA evaluated Industrial Enterprises' property, as well as the other properties in the area, and noted that there had been prior reports of oil pollution at the Site. On July 9, 1999, the EPA sent Industrial Enterprises and 19 other owners of neighboring properties a letter formally notifying them that they were potentially liable for environmental damage at the Site and that there may be "potential response activities at the Site, which [they] may be asked to perform." The letter stated:

> EPA may order PRPs [potentially responsible parties], or any one of them, to perform response actions deemed necessary by EPA to protect the public health, welfare or the environment. Additionally, PRPs may be liable for all costs incurred by the government in responding to any release or threatened release at the Site. . . . Such actions and costs may include, but are not limited to, expenditures for conducting a Remedial Investigation/Feasibility Study (RI/FS).

Industrial Enterprises forwarded the EPA's letter to Penn America, asking Penn America to approve Industrial Enterprises' retention of defense counsel and to reimburse it for the costs of defense. Penn America, however, denied coverage, stating:

> The claim presented arises from continual polluting activities, occurring over a long period of time and in the course of business operations, which do not give rise to a potentiality of coverage under the "sudden and accidental" language of the pollution exclusion. Further, the claim is excluded under the "owned property" exclusion.

Negotiating through its own retained counsel, Industrial Enterprises thereafter entered into a settlement agreement in 2004 with the other potentially responsible parties to form a "Coalition" to respond to the EPA. Under the Coalition settlement agreement, each member of the Coalition agreed to contribute to a Coalition Fund, and Industrial Enterprises contributed $750,000. Each member also released every other member from liability.

Thereafter, in April 2006, the Coalition negotiated with the EPA and entered into an "Administrative Settlement Agreement and Order of Consent" with the agency. In the Agreement, the Coalition agreed to undertake a "Remedial Investigation/ Feasibility Study" concerning cleanup of the Site and to implement the solutions found from the investigation, so long as the EPA approved the investigation's conclusions. The Coalition also agreed to fund the investigation.

Industrial Enterprises subsequently commenced this action to obtain a declaratory judgment that Penn America's CGL policy provides coverage for Industrial Enterprises' response costs, including its attorneys fees and its $750,000 contribution to the Coalition Fund.

On Industrial Enterprises' motion for partial summary judgment, the district court found that Penn America's CGL policy *potentially* covered Industrial Enterprises' liability to the EPA and therefore Penn America had a duty to provide a defense. *Indus. Enters., Inc. v. Penn America Ins. Co.*, No. RBD-07-2239, 2008 WL 4120221 (D. Md. Sept. 2, 2008).

The district court focused only on the pollution exclusion clause which excluded coverage for losses occasioned by pollution unless the pollution was "sudden and accidental."* It concluded,

> [Industrial Enterprises] has submitted extrinsic evidence that, at least arguably, demonstrates that an oil spill occurred in or around the five parcels owned by [Industrial Enterprises] during the relevant policy period, and that this incident was specifically relied upon by the EPA in its decision to issue the demand letter. . . . Based on [this evidence], this Court finds that [Industrial Enterprises] has established that there is a potentiality of coverage, even if such potential is remote.

*Id.* at *6. Based on its finding of a potentiality of coverage, the court concluded that Penn America was liable for Industrial Enterprises' defense costs. *Id.* at *5-6 (citing *Clendenin Bros. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 393 (Md. 2006) (requiring insurance companies to provide a defense if there is a potentiality that the policy covers the claim)). The district court denied summary judgment on Industrial Enterprises' claim for reimbursement of the $750,000 payment it made to the Coalition Fund, ruling that there were issues of material fact regarding the purpose of that payment, which had to be resolved at trial.

---

*The pollution exclusion in the policy reads:

> The insurance does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, wastes materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or other water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Emphasis added).

At a bench trial, the district court held that no portion of the $750,000 paid to the Coalition Fund was a defense cost because Industrial Enterprises paid the money to settle potential liability to the other potentially responsible parties and not to defend itself against the EPA's demands.

From the district court's final judgment, dated June 12, 2009, Penn America filed this appeal, challenging the district court's ruling on coverage, and Industrial Enterprises filed a cross-appeal, challenging the district court's finding that the $750,000 payment to the Coalition Fund was not a cost of defense.

## II

In claiming that its CGL policy did not provide indemnity for costs incurred by Industrial Enterprises in response to EPA's regulatory actions under CERCLA, Penn America contends (1) that such costs are not damages because of "property damage" of a third party, as required for coverage under the CGL policy, relying on *Bausch & Lomb*, 625 A.2d 1033-36; and (2) that the pollution exclusion applied because facts to support the exception to the exclusion—that any "release or escape" of the hazardous substances on Industrial Enterprises' property be "sudden and accidental"—were not demonstrated.

At the outset, we address Industrial Enterprises' first argument that Penn America failed to raise the "property damage" issue before the district court and therefore cannot argue the issue on appeal or, if it can, that the issue must be reviewed for plain error.

Industrial Enterprises asserts that in the district court, Penn America did not present the "property damage" argument under *Bausch & Lomb* in its memorandum in response to Industrial Enterprises' motion for partial summary judgment on coverage and that Penn America's later attempt to file a surreply memorandum to raise the argument was rejected by

the district court. Accordingly, Industrial Enterprises contends that Penn America did not effectively preserve for appeal its argument that response costs are not property damage. *See In re Wallace & Gale Co.*, 385 F.3d 820, 835 (4th Cir. 2004) (observing that "the failure of a party at trial to raise a certain interpretation of an insurance contract results in a waiver of that argument on appeal absent exceptional circumstances").

In its initial memorandum in support of its motion for partial summary judgment, Industrial Enterprises itself cited *Bausch & Lomb*, but only for the proposition that the EPA's July 9, 1999 letter was sufficiently coercive so as to constitute a third party's claim. Neither Industrial Enterprises nor Penn America pointed out that *Bausch & Lomb*'s holding might also be dispositive of this case on the issue of whether regulatory response costs are property damage. After receiving Industrial Enterprises' reply memorandum and after a lapse of some months, Penn America filed a motion for leave to file a surreply memorandum in which it proposed to make the *Bausch & Lomb* property damage argument explicitly, and it attached to its motion a memorandum on the issue. Penn America apparently had to ask for leave to file the additional memorandum because the time for briefing under the district court's schedule had lapsed, even though 12 days remained before oral argument would take place. The district court denied the motion for leave to file a surreply memorandum, not because the memorandum would be late, but because the court thought that the motion for partial summary judgment had been "more than adequately briefed at the time."

Nonetheless, at oral argument, Penn America developed its *Bausch & Lomb* argument extensively, and its argument fills some 10 pages of transcript. J.A. 380-390. When the district court then asked Industrial Enterprises' counsel, "Is [Penn America's counsel] correct that there has to be third-party property liability for the policy to be triggered," counsel for Industrial Enterprises objected to the district court's consideration of the argument, *see* J.A. 395-97, but counsel also

argued the merits of the issue, *see* J.A. 397-402. In its summary judgment decision, however, the district court did not address the *Bausch & Lomb* issue explicitly, focusing instead on whether the pollution at issue was "sudden and accidental" and therefore fell within the exception to the pollution exclusion clause.

In view of this record, we conclude that the *Bausch & Lomb* property damage issue was not only presented to the district court in the course of its consideration of Industrial Enterprises' motion for partial summary judgment, but it was also argued by both parties. While the district court did not specifically address the issue in its ultimate ruling, Penn America surely preserved the issue for appeal.

### III

We now turn to the merits of whether Industrial Enterprises' liability for response costs under CERCLA was covered by the insurance policy. The CGL policy in this case contains the standard language of coverage for such policies:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as *damages because of . . . property damage to which this insurance applies*.

(Emphasis added). We must therefore decide whether Industrial Enterprises' CERCLA liability was liability for "damages because of . . . property damage to which this insurance applies."

Penn America contends that the liability asserted by the EPA in its July 9, 1999 demand letter does not assert liability for damages to property of the federal government, but rather asserts regulatory liability under CERCLA. It argues, "Although the federal government has constitutionally-derived power to regulate regarding many surface waters in the

United States, it does not own them," and it asserts that the "remediation [demanded in this case] was done pursuant to a regulatory framework for protecting the environment. . . . [G]overnmental regulation but not governmental property ownership was at issue: the United States of America does not own the waters of the State of Maryland, notwithstanding that the federal government may exercise regulatory control over them." Penn America concludes that in these circumstances, the *Bausch & Lomb* case, which addressed the same issue in a similar factual context, requires, as controlling state law, the conclusion that its CGL policy does not provide coverage for such regulatory response costs.

In response, Industrial Enterprises seeks to distinguish *Bausch & Lomb* because it involved contaminated *groundwater* on Bausch & Lomb's property, whereas in this case, the EPA was regulating the *surface water* on Industrial Enterprises' property. It claims that while the State of Maryland had no property interest in groundwater, the federal government does have a property interest in surface water. On that basis, it argues that the EPA's demand letter asserted Industrial Enterprises' liability for property damage to the federal government's property interest in the surface water on Industrial Enterprises' land and therefore that liability was insured under the CGL policy.

Because our jurisdiction is based on diversity of citizenship and the jurisdictional amount under 28 U.S.C. § 1332, we apply Maryland law to resolve this insurance coverage issue. The seminal Maryland decision in this area is *Bausch & Lomb*, 625 A.2d 1021 (Md. 1993). In *Bausch & Lomb*, the Maryland Court of Appeals held that a standard CGL policy did not provide coverage for the cost of meeting the state government's demand to remove contaminated soil and thus protect groundwater on the insured's property because, in making its demand, the government was acting as a regulator, not as an injured property owner. The court reasoned that "[a] hallmark of the comprehensive general liability policy is that it

insures against injury *done to a third party's property*, in con-tradistinction to an 'all-risks' policy also covering losses sus-tained by the policy-holder." *Id.* at 1033 (emphasis added).

Distinguishing a loss sustained by the insured from damage done to a third party's property, *Bausch & Lomb* addressed whether the "State of Maryland possessed the requisite prop-erty interest in the groundwater affected by the . . . contamina-tion to qualify it as a third party whose property was damaged by the pollutants." *Id.* Acknowledging that Maryland's juris-diction extended to the "waters of the State" which was statu-torily defined as both surface and underground water, *id.* at 1034, the *Bausch & Lomb* court rejected an argument that in protecting the environment for the public health and welfare, the State was protecting its proprietary interest in the waters of the State. It stated, "The term 'waters of the State' has no significance with respect to the proprietary ownership of such waters." *Id.* at 1035. It explained:

> [T]he legislature has attributed to the State broad powers in respect to water resources, including groundwater. Taken collectively, with due regard to the statutes' articulation of the State's interests in preserving the environment, these legislative pro-nouncements demonstrate that the State has commit-ted itself to regulatory oversight of the groundwaters of Maryland to benefit its citizens.

*Id.* The court then concluded:

> The State's interest in groundwater rests on its power to preserve and regulate. That power does not consti-tute a property interest within the contemplation of the insurance policy in dispute.

*Id.* at 1036. Because the State was acting as a regulator, not a property owner, and the CGL policy insured only against the insured's liability for damages to a third party's property,

the court concluded that the insurance company had no obligations arising from its CGL policy.

Similarly in this case, the federal government, acting under the authority of CERCLA, threatened Industrial Enterprises with liability under CERCLA for the costs of cleaning up hazardous substances on its property. In its July 9, 1999 demand letter, the EPA advised Industrial Enterprises of its potential liability under CERCLA to investigate and, if necessary, remove hazardous substances from its property, citing 42 U.S.C. § 9607(a) (creating a property owner's strict liability for the costs of investigation and of removing hazardous substances from his property). The letter related that the EPA "ha[d] documented the release or threatened release of hazardous substances, pollutants or contaminants at or from" Industrial Enterprises' property, as well as from neighboring properties, and stated, "to protect the public health, welfare or the environment," Industrial Enterprises might be required to perform response action by either remediating the conditions or paying for the EPA's remediation. The letter also admonished Industrial Enterprises that it might be required "to pay for damages for injury to, destruction of, or loss of natural resources." The EPA's demand, therefore, while ultimately aimed at protecting the environment and the public health, was specifically directed at remediating the presence of hazardous substances on Industrial Enterprises' land.

As in *Bausch & Lomb*, the EPA was not attempting to vindicate the government's rights as a property owner but rather to fulfill the government's duty to regulate and remediate hazardous substances on private property. CERCLA authorizes the EPA to protect the environment, which includes any "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States." 42 U.S.C. § 9601(8)(B). Accordingly, just as *Bausch & Lomb* held that the government's demand for pollution cleanup was not liability because of damage to the government's property, we hold that the EPA's demand to Industrial Enterprises did

not create potential liability for damage to the federal government's property, but rather created regulatory liability for response costs. *See Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325, 1329 (4th Cir. 1986) (holding a government's lawsuit filed under CERCLA was not an action to collect for property damage, as the term is used in a CGL policy, but rather for response costs). Because the EPA was exercising its jurisdiction over surface waters "within the United States" to protect "the public health, welfare, and the environment," it was functioning as regulator, not a property owner, just like the State of Maryland in *Bausch & Lomb*. Thus, notwithstanding Industrial Enterprises' effort to distinguish *Bausch & Lomb*, we find it controlling.

The settlement agreement reached by the Coalition of property owners and the EPA in this case confirms that the EPA asserted regulatory liability for the cleanup of hazardous substances on Industrial Enterprises' property and not liability for property damage of a third party. In the "Administrative Settlement Agreement and Order on Consent," the Coalition members undertook duties related to "five source areas [within the Site] that were used as landfills from the mid-1940s through the early 1970s," which the agreement stated were located "in a low-lying area, originally occupied by wetlands that were filled by various means over time." It noted that the "[p]ast independent land disposal operations were located at specific source areas *at the Site*, and involved the disposal and landfilling of a variety of solid and liquid municipal solid, industrial and commercial wastes" (emphasis added), constituting "hazardous substances," as defined by CERCLA, 42 U.S.C. § 9601(14). The Coalition members agreed to fund an investigation *of the Site* for the purpose of defining a proposal to remedy the conditions there and to implement the proposal, if approved by the EPA. And the agreement recognized that cleanup of the Site was "necessary to protect the public health, welfare or the environment," constituting the "exclusive mechanism" for resolving the disputes giving rise to the settlement agreement. Thus, the entire

agreement was framed in terms of remediating hazardous substances on the property of Industrial Enterprises and neighboring properties, and nowhere in the agreement do the parties discuss or address compensation for damages to property of the United States.

Finally, in addition to noting that we are bound to apply controlling Maryland law, we find that *Bausch & Lomb*'s construction of the insuring language in standard CGL policies makes good sense in the circumstances presented by this case. While CERCLA itself allows parties to insure against CERCLA liability, 42 U.S.C. § 9607(e)(1) ("Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section"), there is no evidence to indicate that Penn America's CGL policy was intended to protect against that risk. The standard CGL policy language, which preceded the enactment of CERCLA in 1980, was formulated to address an insured's tort liability for property damage caused to third parties. The scope of that risk was well understood, and there is no evidence to indicate that the broad, indeterminate risks of CERCLA liability somehow became automatically includable in the term "property damage" upon the enactment of CERCLA, without any change to the policy language. *See Maryland Casualty Co. v. Armco Co.*, 822 F.2d 1348, 1354 (4th Cir. 1987) ("In the absence of clear contract language . . . we decline to extend the obligations of insurance carriers beyond the well-illuminated area of tangible injury and into the murky and boundless realm of injury prevention"). As one commentator explained:

> It long has been recognized that potential liability for economic loss independent of any liability for personal injury or property damage is relatively indeterminate and therefore difficult to insure. Superfund liability is a classic case of this form of liability because the cost of cleaning up a hazardous waste site may far exceed the value of the property to be

> cleaned up, yet nonetheless be required by the Superfund regime. In addition, because this regime now requires cleanup in accordance with extremely high safety standards, the cost of cleanup may far exceed the discounted present value of the potential future bodily injury and property damage that cleanup prevents.

Kenneth S. Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum. L. Rev. 942, 969 (1988) (footnotes omitted). Precisely because of the indeterminate nature of Superfund liability, the term "property damage" in the standard CGL policy, which referred to risks of tort damage, was not meant to insure against this form of regulation.

In sum, we hold that Penn America's standard CGL policy, which provides indemnity to Industrial Enterprises for sums that it becomes legally obligated to pay as damages because of property damage, does not provide indemnity to Industrial Enterprises for regulatory liability (including remediation costs) under CERCLA. And because the standard CGL policy in this case does not provide coverage for CERCLA liability, Penn America had no duty to provide a defense or to pay the costs of a defense with respect to such liability.

Because of this holding, we need not reach the other issues presented in this appeal.

For the reasons given, we reverse and remand with instructions to enter judgment in favor of Penn America.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

KING, Circuit Judge, dissenting:

The majority relies on the decision of the Court of Appeals of Maryland in *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 625 A.2d 1021 (Md. 1993), to support its conclu-

sion that environmental contamination for which the government seeks remediation cannot constitute "property damage" triggering the duty to defend under a general commercial liability ("GCL") insurance policy issued in Maryland. *See ante* at 4. With all respect for my distinguished colleagues, *Bausch & Lomb* does not control the result in this case, and I therefore dissent.

The issue is not whether contamination of land, surface water, or groundwater is damage to property (it assuredly is), but whether the contamination damages a third person's property such that the liability coverage provisions of a GCL policy are implicated. *Bausch & Lomb* stands for the proposition that when the contamination is confined to the insured's own property, the remedial directives of state or federal regulators are not sufficient to confer a coexistent property interest upon the government such that it may be considered a damaged third party for the purpose of securing GCL coverage. *See* 625 A.2d at 1036 ("The State's interest . . . rests on its power to preserve and regulate. That power does not constitute a property interest within the contemplation of the insurance policy in dispute.").

In *Bausch & Lomb*, there was no credible indication that the pollution contaminating the insured's soil and groundwater affected any property other than its own. In one instance, a solvent contaminant identified as TCE had been released into a surface stream that crossed onto adjoining property, but the parties' experts "agreed that because water tainted by TCE is rapidly cleansed upon exposure to air, the contamination of the stream did not pose a significant threat of further pollution." 625 A.2d at 1025 n.4. The owner of the adjoining parcel wrote the insured once, threatening to sue for TCE contamination, but "let the matter drop. Its threat . . . never materialized into . . . a legitimate claim for damages." *Id.* at 1036. Had downstream contamination been confirmed, the insurer "would have been obliged to pay the costs of any direct remediation . . . itself." *Id.*

Here, by contrast, it is undisputed that the EPA proposed designating the insured's property as a Superfund site "because it contends that contaminants will be washed from the surface during floods and threaten the Chesapeake Bay." J.A. 243. A number of years before the EPA's latest involvement, the property had been the site of a fuel oil release into "a tributary to Back River," and that release eventually "entered the Waters of the State." J.A. 59; *see ante* at 5.

Under the GCL Policy, Penn America is bound to provide coverage for "property damage" inflicted by its insured upon third parties, in the "sums which the insured shall become legally obligated to pay." J.A. 209. There is no requirement of identity, that is, the damaged third party need not initiate or participate in the process that gives rise to the legal obligation. Even if such a requirement existed, it is surely satisfied whenever the government chooses to act on behalf of a third party as *parens patriae*, "or as universal trustee for the people." *Ghingher v. Pearson*, 168 A. 105, 119 (Md. 1933).

Because the EPA has imposed a legal obligation in this case upon Penn America's insured, Industrial Enterprises, at least in part to remedy property damage suffered (or threatened to be suffered) by third parties, I am convinced that the insured has satisfied the minimal threshold showing that its claim is at least potentially covered by the GCL Policy. *See Clendenin Bros. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 392-93 (Md. 2006) ("If there is a possibility, even a remote one, that the plaintiff's claims could be covered by the policy, there is a duty to defend." (internal citations omitted)). *Bausch & Lomb*, distinguishable on its facts, is simply not to the contrary.

The district court never addressed the applicability of *Bausch & Lomb* to Penn America's argument on appeal that the costs of compliance with the EPA's mandate were not expenditures for "property damage." The court had a good reason for its inaction: the point was nowhere included within

Penn America's otherwise comprehensive response to the motion for partial summary judgment and supporting memorandum submitted by Industrial Enterprises. Months later, Penn America appeared to have realized the potential import of the decision in *Bausch & Lomb*, as it belatedly sought to raise the "property damage" issue through a surreply proposed over objection just eight days prior to the summary judgment hearing.

Although the court denied the surreply, counsel for Penn America could not resist arguing *Bausch & Lomb* at hearing, *see* J.A. 380-95, spurring further objection from her colleague in opposition, *see id.* at 395-97, 413. The court did not expressly rule on the objection from the bench, but its prior disposition of the proposed surreply and the subsequent omission from its opinion of even the most cursory discussion of the issue admits of no other conclusion than that the objection was consciously and deliberately sustained. The district court's case management decision is one that we are bound to respect. *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 132-33 (3d Cir. 1998) (recognizing that lower court's waiver ruling reviewed for abuse of discretion). Without evaluating whether the district court here abused its discretion, the majority merely asserts that "Penn America surely preserved the issue for appeal." *Ante* at 10.

In any event, because I conclude that *Bausch & Lomb* does not govern this particular dispute, I would deny both the appeal and the cross-appeal, affirming the well-crafted rulings of the district court and adopting the sound reasoning set forth in the relevant opinions of my good friend Judge Bennett. *See Indus. Enters., Inc. v. Penn Am. Ins. Co.*, No. 1:07-cv-02239 (D. Md. Sept. 2, 2008) (awarding partial summary judgment against insurer on duty to defend); *Indus. Enters., Inc. v. Penn Am. Ins. Co.*, No. 1:07-cv-02239 (D. Md. May 7, 2009) (denying partial summary judgment request of insurer and awarding certain defense costs and attorney fees to insured); *Indus. Enters., Inc. v. Penn Am. Ins. Co.*, No. 1:07-cv-02239

(D. Md. June 12, 2009) (denying, inter alia, $750,000 of insured's asserted defense costs); *Indus. Enters., Inc. v. Penn Am. Ins. Co.*, No. 1:07-cv-02239 (D. Md. Nov. 3, 2009) (denying, inter alia, motions to alter judgment).