# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Water Applications & Systems Corp. v. Bituminous Casualty Corp.*,
2013 IL App (1st) 120983

---

| | |
|---|---|
| Appellate Court Caption | WATER APPLICATIONS AND SYSTEMS CORPORATION, n/k/a WASCO LLC, Plaintiff-Appellant, v. BITUMINOUS CASUALTY CORPORATION, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-0983 |
| Filed | February 15, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly dismissed a complaint alleging that defendant insurer breached its duties to defend plaintiff after the Environmental Protection Agency gave plaintiff notice of potential liability, since the policies at issue were issued to a company plaintiff purchased, the antiassignment provisions in the policies were enforceable under the governing Maryland law, defendant never gave written consent to an assignment, and even assuming the policies were properly assigned, they did not cover a regulatory action by the Agency. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-16371; the Hon. LeRoy Martin, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Daniel J. Biederman, Sr., of Biederman & Novi, LLC, of Chicago, for appellant.

John E. Rodewald and Richard B. Boroski, both of Bates Carey Nicolaides LLP, of Chicago, for appellee.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion. Presiding Justice Lampkin and Justice Reyes concurred in the judgment and opinion.

## OPINION

¶ 1    The plaintiff, WASCO LLC, filed this suit claiming that defendant Bituminous Casualty Corporation, an insurance company, breached its duties under two insurance policies when it did not defend plaintiff after receiving a notice of potential liability from the United States Environmental Protection Agency (EPA) during an EPA investigation process. Defendant claims that plaintiff cannot be an assignee of the policy without defendant's written consent pursuant to the terms of the insurance policy. Plaintiff claims that no written consent is required. The trial court granted defendant's motion for summary judgment dismissing the suit. Plaintiff appeals, and for the following reasons, we affirm.

¶ 2                          BACKGROUND

¶ 3    Plaintiff filed a breach of contract action against defendant involving two general liability insurance policies where plaintiff was not named as an insured. Plaintiff argues that it assumed the policies by purchasing the assets of Palm Oil Recovery, Inc., a palm oil recycling company, the named insured. Defendant claims that plaintiff did not present sufficient evidence to create a material issue of fact about whether it was covered under the subject policies, and defendant further argues that the subject policies could not be assigned without defendant's consent.

¶ 4                I. The Policies and the Purchase Agreement

¶ 5    Policy A was issued as an "occurrence" liability policy (No. GA637258; hereinafter Policy A) for the policy period of November 6, 1968, through November 9, 1971. Under the section titled "Comprehensive General Liability Insurance," Policy A provided the following coverage:

"The company [defendant] will pay on behalf of the **insured** [Palm Oil Recovery, Inc.,]

-2-

sums which the **insured** shall become legally obligated to pay as **damages** because of

> A. **bodily injury** or

> B. **property damage**

to which this insurance applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking **damages** on account of such **bodily injury** or **property damage**, even if any of the allegations in the suit are groundless, false, or fraudulent, and may make any such investigation and settlement of any claim or suit as it deems expedient ***."

¶ 6     Policy A defines "occurrence" as "an accident, including injurious exposure to conditions, which results during the policy period, in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**." It defines "damages" as including "damages for death and for care and loss of services resulting from **bodily injury** and damages for loss of use of property resulting from **property damage**." "Property damage" is defined as "injury to or destruction of tangible property." Policy A also contains an antiassignment clause, which states:

> "**9. Assignment:** Assignment of interest under this policy shall not bind the company unless its consent is endorsed hereon ***."

On January 15, 1971, Policy A was amended by endorsement to add "PORI, INC." as a named insured, effective January 1 of that year.

¶ 7     Palm Oil Recovery, Inc.'s corporate history since the issuance of Policy A is disputed between the parties. Plaintiff claims that, in 1971, Palm Oil Recovery, Inc., merged with some other companies to form Pori, Inc., which was then sold in 1981 to Pori Holdings, Inc., and thereafter renamed PORI International, Inc. We will discuss the evidentiary basis for plaintiff's factual claims in its proper sequence.

¶ 8     On November 30, 1971, defendant issued a second third-party liability insurance policy (No. GA686764; hereinafter Policy B), which covered Pori, Inc., as the named insured from November 9, 1971, through November 9, 1972. Policy B was issued with the same contract language as Policy A and included the same provisions. Under its declarations, Policy B states that it is a renewal of Policy A.

¶ 9     On February 28, 1997, PORI International, Inc., executed an asset purchase agreement (Purchase Agreement) to sell its assets to U.S. Filter Recovery Services (Midatlantic), Inc. (USFRSM), a subsidiary wholly owned by U.S. Filter Recovery Services, Inc. (USFRS). USFRS was a wholly owned subsidiary of United States Filter Corporation (USFC). At the time of the Purchase Agreement, plaintiff was known as USFC. On August 2, 2004, USFC changed its name to Water Applications & Systems Corporation, which was later renamed WASCO LLC on December 22, 2006.

¶ 10    The Purchase Agreement set forth the terms of the sale of PORI International, Inc.'s assets to plaintiff. The Purchase Agreement designated California as the choice of law under

section 8.7:

> "**8.7 Offset; Assignment; Governing Law.** *** This Agreement shall be governed by and construed in accordance with the laws of California without regard to its conflict of law doctrines."

The preamble to the Purchase Agreement sets forth the following:

> "Seller [PORI International, Inc.,] desires to sell and assign to Buyer [USFRSM] *** substantially all of Seller's assets and certain of Seller's liabilities on the terms and subject to the conditions set forth below."

Section 2.1 describes the sale of assets:

> "**2.1 Sale and Purchase of Assets.** At the Closing, Seller shall sell and transfer to Buyer *** all of Seller's properties and business as a going concern and goodwill and assets of every kind ***."

Section 2.3 sets forth the assumption of liabilities:

> "**2.3 Assumption of Liabilities.** *** Buyer shall *** assume *** the following Liabilities of Seller and only such Liabilities ***: (i) those specific Liabilities accrued on the Adjustment Balance Sheet as they exist on the Closing Date ***, and (ii) those Liabilities incurred after the Closing Date and pursuant to the express terms of the Contracts [disclosed on Schedule 3.13, 3.16, 3.20, or 3.21] ***."

Section 3.19 of the Purchase Agreement included the following regarding the assignment of insurance policies under which PORI International, Inc., was insured:

> "**3.19 Insurance.** Schedule 3.19 discloses all insurance policies on an 'occurrence' basis with respect to which Seller is the owner, insured or beneficiary."

It is important to note that schedule 3.19 did not list the subject policies. Section 5.5 provides that PORI International, Inc., would pay the insurance premiums until the closing date of the Purchase Agreement. The Purchase Agreement contained the following provision regarding retained liabilities:

> "**2.4 Retained Liabilities.** Except for the Assumed Liabilities, Buyer does not hereby and shall not assume or in any way undertake to pay, perform, satisfy or discharge any other Liability of Seller, whether existing on, before or after the Closing Date or arising out of any transactions entered into, or any state of facts existing on, prior to or after the Closing Date (the **'Retained Liabilities'**), and Seller agrees to pay and satisfy when due all Retained Liabilities. Without limiting the foregoing, except for the Assumed Liabilities, the term **'Retained Liabilities'** shall include Liabilities:

> * * *

> (v) against which seller is insured or otherwise indemnified ***."

The Purchase Agreement additionally contained the following clause on consent rights:

"**2.12 Certain Consents**. Nothing in this agreement shall be construed as an attempt to assign any contract, agreement, Permit, franchise, or claim included in the Purchased Assets which is by its terms or in law nonassignable without the consent of the other party or parties thereto, unless such consent shall have been given, or as to which all the remedies for the enforcement thereof enjoyed by Seller would not, as a matter of law, pass to Buyer as an incident of the assignments provided for by this Agreement."

The appellate record does not show that defendant consented to the alleged assignment of the subject policies. The appellate record does not contain the alleged assignment or any evidence that its premiums were prorated or paid by plaintiff.

¶ 11                                    II. EPA Investigation

¶ 12      On August 6, 2007, the EPA sent a "Notice of Potential Liability" to Siemens Water Technologies (Siemens). The "Notice of Potential Liability" identified Siemens as a "Potentially Responsible Party" (PRP) to an "Emergency Removal Action."[1] The PRP letter warned that Siemens may incur, or may have incurred, liability under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9607(a) (2006)), and that it might be responsible for the cleanup of the Sauer Dump site in Dundalk, Maryland and/or costs the EPA has incurred in cleaning up the site. The PRP letter requested a response from Siemens within 30 days indicating its willingness or unwillingness to engage in future negotiations concerning the site. A copy of the PRP letter was forwarded to plaintiff, which entered into negotiations with the EPA on August 21, 2007.

¶ 13      On August 17, 2007, the EPA sent Siemens a draft of a proposed "Administrative Settlement and Order on Consent for Removal Response Action" naming several respondents. The draft order names Siemens as a successor in interest to PORI International, Inc., which it alleges improperly disposed of hazardous materials at the Sauer Dump site during the 1960s, 1970s, and 1980s. The draft order indicates that the EPA holds the

---

[1]The EPA is responsible for responding to the release of hazardous substances into the environment under sections 106(a) and 122(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. §§ 9606(a), 9622(a) (2006)). CERCLA imposes liability on parties designated as responsible for the release of hazardous substances into the air, land, surface water, or groundwater. 42 U.S.C. §§ 9601(8)(B), (14), (22), 9607(a), (b). The EPA may seek an injunction requiring the responsible party to clean up a contaminated site, or it may issue an administrative order requiring the responsible party to perform the cleanup, subject to civil fines for a failure to comply. 42 U.S.C. § 9606(a), (b). Alternatively, the government may clean up the site and demand reimbursement for its incurred costs. 42 U.S.C. §§ 9604(a)(1), 9607(a). The EPA may first notify a party that it might be responsible for cleaning up contamination that it allegedly caused. Following an investigation, the EPA may then enter an emergency removal action under CERCLA, which holds the party liable for the cleanup of the contaminated site.

respondents liable for the contamination and requires them to conduct a cleanup of the site. The time period of the claimed dumping coincides with the policy period of the subject policies, which insured Palm Oil Recovery, Inc., and Pori, Inc., against claims that arose between 1968 and 1972. Under section III, titled "Finding of Facts," the removal action states that PORI International, Inc., was sold in 1997 to USFRSM, a subsidiary of USFRS. It further states that USFRS was then sold to Siemens Corporation on August 1, 2004, and that USFRSM then merged into Siemens on August 31, 2006.

¶ 14     On September 28, 2007, plaintiff forwarded a copy of the PRP letter to defendant, requesting that it provide that a defense to the EPA's impending action under the provisions of the subject policies. Defendant responded to plaintiff's letter on May 22, 2008, and informed it that it would not defend against the EPA investigation because it was not a named insured on the insurance policy and it was unable to verify that plaintiff properly assumed the subject polices. Defendant offered to reconsider its decision if plaintiff were to provide additional information showing that it was entitled to coverage. Plaintiff did not provide defendant with any new information.

¶ 15     Plaintiff claims that it obtained evidence proving that PORI International, Inc., did not generate the hazardous materials found at the Sauer Dump site, which led to the EPA's determination that Siemens was not a potentially responsible party. However, the appellate record contains no evidence of this outcome. However, plaintiff incurred $28,186.86 in legal fees in defending the EPA claim. Defendant did not reimburse plaintiff for the costs expended in its defense, nor did it provide counsel.

¶ 16                               III. The Instant Action

¶ 17     Plaintiff brought suit in the circuit court of Cook County against defendant on May 1, 2009. Plaintiff's complaint contained three counts: (1) breach of contract; (2) bad faith under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2004)); and (3) declaratory relief. For counts I and II, plaintiff sought $28,186.86 in damages for defending the EPA's claim.

¶ 18     Plaintiff did not respond to defendant's first set of written interrogatories and the case was dismissed for want of prosecution (DWP) on October 15, 2010. Plaintiff filed a motion to vacate the dismissal, which was granted on November 8, 2010, reinstating the case.

¶ 19     During the discovery process, neither plaintiff nor defendant provided information establishing a link between the subject policies and PORI International, Inc. When questioned at deposition, Robert G. Huerter, plaintiff's designated corporate agent, testified that he did not know if there was a link between Palm Oil Recovery, Inc., or Pori, Inc., and PORI International, Inc.

¶ 20     On November 15, 2011, defendant filed a motion for summary judgment, claiming that plaintiff did not provide any evidence that it had properly assumed the subject policies by assignment and therefore was not entitled to a defense of the EPA matter. Defendant argued

that assignment of the subject policies required defendant's consent, which was not given.

¶ 21 On December 27, 2011, plaintiff filed its response to defendant's motion for summary judgment, claiming that defendant's consent was not required. As part of its response, plaintiff provided two letters that were not produced during the discovery process. The first letter was written to the EPA on April 30, 1997, by Ernest Kovacs, then-president of PORI International, Inc., which detailed the corporate history of PORI International, Inc. In his letter, Mr. Kovacs states that Palm Oil Recovery, Inc., began its operations in 1950. In 1971, Palm Oil Recovery, Inc., combined with other companies to become Pori, Inc. In 1981, Pori, Inc., sold its assets to Pori Holdings, Inc., which later merged with Pori International, Inc., and Pori Holdings, Inc., became the surviving corporation. Pori Holdings, Inc., then changed its name to PORI International, Inc. And, in 1997, PORI International, Inc., sold its assets to USFC, n/k/a WASCO. Mr. Kovacs' letter was not accompanied by an affidavit, deposition testimony, or anything indicating its authenticity or veracity.

¶ 22 The second letter was written on July 3, 1991, by Peter G. Dahl, an insurance broker for PORI International, on the letterhead of Riggs, Counselman, Michaels & Downes, Inc., an insurance brokerage firm, addressed to Anne C. Love, Esq., at Cable, McDaniel, Bowie & Bond,[2] with the subject heading "Re: PORI International, Inc." The letter stated in relevant part:

"Comprehensive General Liability coverage was provided to PORI and its predecessor, Palm Oil Recovery, Inc., for the period of November 9, 1968 to November 9, 1971 by the Bituminous Casualty Corporation. Their policy number was GA637258. ***

* * *

Coverage was renewed in the same company under Policy #GA686764 for the period of November 9, 1971 to November 9, 1972 ***."

Mr. Dahl's letter was also not accompanied by an affidavit and he was not deposed to verify the authenticity of the letter.

¶ 23 On January 17, 2012, defendant filed its reply in support of its motion for summary judgment arguing that the letters were new information not produced during discovery. Defendant further argued that the letters had not been properly authenticated and constituted hearsay evidence that would not be admissible at trial.

¶ 24 On January 27, 2012, plaintiff filed a motion for leave to supplement plaintiff's response to defendant's motion for summary judgment[3] to submit a transcript of the deposition testimony of LeRoy Draper, a corporate designee, as evidence that PORI International, Inc., owned the subject policies that were issued to Palm Oil Recovery, Inc., and Pori, Inc. The deposition was taken on January 23, 1992, in the matter captioned United States of America

---

[2]The appellate record does not indicate either the relationship of this firm to PORI International, Inc., or the exact nature of the correspondence.

[3]The disposition of the motion is not in the record on appeal.

v. Edward Azarael, No. WN-89-2898 (D. Md. 1992), a suit that was pending in the United States District Court for the District of Maryland. In that action, PORI International, Inc., was a third-party defendant and its corporate history was at issue.[4]

¶ 25    The transcript contains the following exchange between Brian R. Land, Esq., on behalf of defendant General Motors Corporation and Thomas L. Crowe, Esq., on behalf of defendant PORI International, Inc.:

> "MR. LAND: Let me ask you a few questions about PORI International's history. I understand that PORI International, Inc., and previous companies that operated at Sparrows Point were known by different names during different time periods. I don't want to go into detail about the company's corporate history, but I do want to establish what names the company was known by and the associated time periods during which it used that name.

> MR. CROWE: We're going to object because I don't think they are necessarily the same company."

Mr. Land then questioned Mr. Draper on the corporate history of Palm Oil Recovery, Inc. Mr. Draper testified that Palm Oil Recovery, Inc., changed its name in 1971. Mr. Land then asked Mr. Draper to read from an exhibit marked as Draper Exhibit 2:

> "MR. LAND: *** This is a document that's been produced by BFI in this matter, it was formerly known as Robb Tyler, Inc. It's a letter on PORI letterhead dated December 31st, 1970, with the caption: We are happy to announce a change in our name. Do you recall this document?

> MR. DRAPER: Not specifically.

> MR. LAND: Why don't you read the first two paragraphs.

> MR. DRAPER: Gentleman: We are happy to announce a change in our name. You've known us till now as Palm Oil Recovery, Inc. and Palm Oil Recovery, Pennsylvania, Inc., and Palm Oil Recovery, West Virginia, Inc. Starting January 1, 1971, all three corporations will be joined together in PORI, Inc.

> MR. LAND: Is that consistent with your recollection of about the time the name change took place?

> MR. DRAPER: Yes."

Mr. Draper then testified that Pori, Inc., subsequently changed its name in 1979 to Pori Holdings, Inc., and that in 1980 or 1981, the name was again changed to PORI International, Inc. Mr. Land then presented another letter to Mr. Draper, this one marked as Draper Exhibit 3:

---

[4]The appellate record does not explain the exact nature of the controversy in United States of America v. Edward Azarael, No. WN-89-2898 (D. Md. 1992), or the eventual outcome of the suit.

"MR. LAND: *** This is a letter dated May 16, 1989, from Daryl Tuckey, director of environmental affairs and safety, to Joan Martin-Banks, U.S. Environmental Protection Agency, on PORI International, Inc. letterhead. Can you take a look at the first numbered paragraph, No. 1, and read that to me?

MR. DRAPER: Palm Oil Recovery was the name the firm used from its inception in 1950 until approximately 1971. In that year the name was changed to PORI, Inc., and in 1981, the firm's name was again changed to PORI International, Inc., which it still retains today. ***

* * *

MR. LAND: In terms of the names of the companies, the company or companies, and the time periods it held those names, is it accurate to that extent?

MR. DRAPER: Yes ***."

¶ 26        On February 2, 2012, defendant filed its opposition to plaintiff's motion for leave to supplement its response to defendant's motion for summary judgment. Defendant argued in his reply brief that the transcript was unauthenticated, inadmissible hearsay evidence that was not produced in discovery. Defendant argued that the transcript was not signed or certified by the clerk of court, nor was it accompanied by an affidavit or other documentation to verify its authenticity.

¶ 27        The appellate record is silent about whether the trial court ever ruled on plaintiff's motion and whether the trial court considered the letters in its decision-making process.

¶ 28        The trial court granted plaintiff's motion for summary judgment on March 2, 2012. The trial court's order stated in full:

"The motion coming to be heard on Defendant Bituminous Cas. Corp.'s Motion for Summary Judgment filed November 15, 2011. The court being full advised of the premises, it is hereby ordered that:

    1. The Motion for Summary Judgment is granted and judgment is entered in favor of Bituminous. This is a final and appealable order."

Although the order contains a "1.," there was no "2." Neither a transcript of the hearing nor a bystanders report for March 2, 2012, is provided in the appellate record.

¶ 29                                                    ANALYSIS

¶ 30        Plaintiff filed this appeal seeking to reverse the trial court's order granting summary judgment in favor of defendant. Plaintiff claims that the trial court erred because plaintiff presented sufficient evidence to create a material issue of fact about whether it owns the subject policies and is entitled to a defense in an action by the EPA. Plaintiff also argues that it assumed the subject policies when it purchased the assets of PORI International, Inc., in 1997. Defendant claims that the policies were not assigned to plaintiff because they were not

listed under schedule 3.19 of the Purchase Agreement. Defendant further argues that plaintiff failed to provide any evidence of ownership of the subject policies, which require defendant's consent in order for the policies to be assigned. We will first determine whether the Purchase Agreement listed the policies at issue to be assigned to plaintiff. Next, we will explore whether the antiassignment clause in the insurance policies prohibited the transfer of the policies to plaintiff. Last, we will review whether the policies covered the EPA's investigation process. We need not address defendant's remaining argument that plaintiff has not presented sufficient evidence to show that it owned the policies prior to the asset sale because we affirm on other grounds.

¶ 31                                    I. Standard of Review

¶ 32    Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008). We review a circuit court's decision on a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means the reviewing court performs the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 33    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). "Mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet its burden of proof either by affirmatively showing that some element of the case must be resolved in its favor, or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis, and even if the trial court's reasoning was incorrect. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 34                                    II. The Purchase Agreement

¶ 35    Plaintiff argues that it assumed the subject policies in the Purchase Agreement, which assigned to plaintiff "substantially all of [PORI International, Inc.'s] assets and certain *** liabilities." Defendant claims that while the sale included many insurance policies, the policies at issue were not identified among them. Defendant argues that any insurance policies not named in the Purchase Agreement are retained liabilities that do not transfer in an asset sale.

¶ 36     The Purchase Agreement did not assign the subject policies to plaintiff. Section 3.19 of the Purchase Agreement states:

> "**3.19 Insurance.** Schedule 3.19 discloses all insurance policies on an 'occurrence' basis with respect to which Seller [PORI International, Inc.,] is the owner, insured or beneficiary."

Schedule 3.19 lists several insurance policies but does not list the policies issued by defendant. It is undisputed between the parties that the subject policies are on an "occurrence" basis.

¶ 37     The Purchase Agreement further states that any liabilities that are not named in the Purchase Agreement are considered retained liabilities. Section 2.4 sets forth the following regarding retained liabilities:

> "**2.4 Retained Liabilities.** Except for the Assumed Liabilities, Buyer does not hereby and shall not assume or in any way undertake to pay, perform, satisfy or discharge any other Liability of Seller, whether existing on, before or after the Closing Date or arising out of any transactions entered into, or any state of facts existing on, prior to or after the Closing Date (the **'Retained Liabilities'**), and Seller agrees to pay and satisfy when due all Retained Liabilities. Without limiting the foregoing, except for the Assumed Liabilities, the term **'Retained Liabilities'** shall include Liabilities:

> * * *

> (v) against which seller is insured or otherwise indemnified ***."

Since the subject policies were neither named in schedule 3.19 nor listed in the Purchase Agreement as assumed liabilities, it follows that any liabilities that were covered by the subject policies were retained by PORI International, Inc., as retained liabilities under section 2.4.

¶ 38     Plaintiff claims that the schedule 3.19 did not name the subject policies because of the sheer number of policies that were assigned. However, there is no evidence in the appellate record to support plaintiff's claim. Plaintiff also argues that section 5.5 of the Purchase Agreement provides for the assignment of defendant's policies. Section 5.5 states in full:

> "**5.5 Insurance.** Following the Closing, Seller shall, to the extent that coverage under its insurance policies extends to include the Business in respect of claims or occurrences concerning Seller prior to the Closing: (i) take no action to eliminate or reduce such coverage, other than normal elimination or reduction of coverage as they occur by virtue of the filing of claims in the ordinary course under such insurance policies; (ii) pay when due any premiums under such policies for periods ending prior to the Closing Date, including retrospective or retroactive premium adjustments; and (iii) use its best efforts to assist in filing and processing claims under, and otherwise cooperate with Buyer (and their successors) to allow them, in their own names, or on behalf of Seller, to obtain all coverage benefits applicable to the Business under such insurance policies, including the execution of assignments or powers of attorney for the benefit of Buyer. Any proceeds

of insurance paid by an insurer to Seller for claims of Buyer made in accordance with this Section shall be promptly paid to Buyer."

In its entirety, section 5.5 does not assign the subject policies to plaintiff. Instead, section 5.5 describes PORI International, Inc.'s future responsibilities regarding insurance policies that were not assigned to plaintiff in the asset sale. Section 5.5 requires PORI International, Inc., to do the following: (1) take no action to eliminate or reduce a policy's coverage; (2) pay the premiums due prior to the assignment; and (3) assist plaintiff in filing claims as well as executing assignments for the benefit of the buyer. This provision does not operate as a present assignment. *Ellison Educational Equipment, Inc. v. Chen*, No. SACV02-1184-JV5, 2004 WL 3154592 (C.D. Cal. 2004).[5] Instead, it is an agreement to execute an assignment in the future. *Ellison Educational Equipment, Inc.*, 2004 WL 3154592.

¶ 39 Additionally, there is no evidence in the appellate record that the subject policies were assigned to plaintiff at any other point in time. The policies at issue were not named in the asset sale. The Purchase Agreement clearly states that all insurance policies that are assigned are named in schedule 3.19, which does not list the subject policies. It follows that all insurance policies that were not assigned are retained liabilities that remain with PORI International, Inc., pursuant to Section 2.4 of the Purchase Agreement.

¶ 40 We find that the Purchase Agreement did not assign the subject policies to plaintiff because they were not listed in schedule 3.19. There is no evidence in the appellate record to show that PORI International, Inc., or plaintiff intended for there to be any additional insurance policies included in the sale beyond what was listed in schedule 3.19. Also, section 5.5 specifies PORI International, Inc.'s future responsibilities and does not operate as a present assignment of the subject policies to plaintiff. Thus, we find that the Purchase Agreement did not assign the policies to plaintiff.

¶ 41                                             III. Choice of Law

¶ 42 In order to interpret the construction of the subject policies, we must first determine under which state's laws the policies are governed. The subject policies do not contain an express choice of law provision. If an insurance policy does not specify a choice of law, its provisions are generally governed by the following factors: " 'location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.' " *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 527 (1995) (quoting *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill. 2d 522, 528 (1975)). "Two cases have specifically stated that an insurance policy is governed by the law of the State where the policy was issued or delivered or by the law of the place of the last act to give rise to a valid contract." *Lapham-Hickey Steel*

---

[5]We cite California law on this issue because section 8.7 of the Purchase Agreement states that its provisions shall be construed in accordance with the laws of California.

*Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d at 527 (citing *United States Fire Insurance Co. v. CNA Insurance Cos.*, 213 Ill. App. 3d 568, 575 (1991), and *Jadczak v. Modern Service Insurance Co.*, 151 Ill. App. 3d 589, 593 (1987)).

¶ 43      In the instant case, the evidence available in the record points to Maryland as the appropriate choice of law governing the interpretation of the subject policies.[6] Regarding the first factor, the occurrence giving rise to the EPA investigation took place at the Sauer Dump site in Maryland. It was at this location that the EPA alleged that PORI International, Inc., contaminated the environment with hazardous materials during the 1960s, 1970s, and 1980s. The Sauer Dump site was the only location that the EPA's draft order held Siemens liable for cleaning up. Also, the PRP letter did not allege PORI International, Inc., was liable for waste disposal in any other state.

¶ 44      We next look to the domicile of the insurer and the insured. Defendant is an insurance company with its principle place of business in Illinois. As far as the evidence available in the appellate record, this appears to be the only contact with Illinois in the insurance contracts. Plaintiff WASCO has its registered office in Delaware and currently exists as a limited liability corporation under Delaware law. However, Palm Oil Recovery, Inc., is designated as the named insured in Policy A, which lists its address as a post office box in Maryland. Also, in Policy B, Pori, Inc., is designated as the named insured and identified with a different post office box in Maryland. Though plaintiff now exists as a Delaware corporation, it allegedly purchased the assets of Palm Oil Recovery, Inc., and Pori, Inc., which were identified as being located in Maryland at the time it executed the subject policies.

¶ 45      Another factor we must consider is where the subject policies were executed. Both policies are divided into two sections: part A provides automobile insurance coverage, and part B provides for general liability insurance coverage. Both policies include a provision that states that the "policy shall not be valid unless countersigned by a duly authorized representative of the company [defendant]." In both policies, part B was countersigned by defendant in the state of Maryland.[7] As such, it appears that defendant's signature was the last act that gave rise to a valid contract, which occurred in Maryland.

¶ 46      Also, we must consider in which states the subject policies provided coverage. Both policies insure premises operations in the states of Maryland, Pennsylvania, Ohio, and West

---

[6]In the appellate briefs, plaintiff presumes Illinois law governs, but does not explain this choice by way of a conflict of laws analysis quoted from *Hofeld*. Plaintiff instead argues that the appellate record "does not contain sufficient facts to permit a decision regarding what law to apply" and that this court should reverse and remand to the trial court. Defendant does not address the *Hofeld* conflict of laws test.

[7]In Policy A, defendant countersigned parts A and B in Maryland in a single endorsement on November 11, 1968, the date the policy was issued. In Policy B, defendant countersigned part A in Pennsylvania, while part B was countersigned in Maryland in an endorsement. Both signatures in Policy B were dated November 30, 1971, the date the policy was issued.

Virginia. The policies itemize the premiums due for each location, with the premises in Maryland requiring a substantially higher premium than the operations in other states. Also, the policies cover certain vehicles owned by the insured in Maryland, Pennsylvania, and Ohio. Most of the vehicles owned were located in Maryland.

¶ 47    Weighing all of the factors, Maryland is the proper choice of law. The most significant contacts are in the state of Maryland, including the address of the named insureds, the location where the policies were issued by defendant's countersignature, and the location of the environmental contamination that gave rise to the EPA investigation. Also, the setting of the policies' premium appears to be more connected to Maryland, because a higher premium is found on premises located in Maryland and it is indicated that more vehicles insured are driven in that state.

¶ 48    Defendant argues that California law, the choice of law set forth in the 1997 Purchase Agreement, should apply. Section 8.7 of the Purchase Agreement states that it "shall be governed by and construed in accordance with the laws of California without regard to its conflict of law doctrines." Defendant additionally points to section 2.12 of the Purchase Agreement, which states: "Nothing in this agreement shall be construed as an attempt to assign any contract *** included in the Purchased Assets which is by its terms or in law nonassignable without the consent of the other party or parties thereto ***." Defendant argues that this clause prohibits the assignment of contracts that are nonassignable under law, which the Purchase Agreement designates as California law in its choice of law provision.

¶ 49    However, the issues presented in the instant case involve the interpretation of the subject policies, not the Purchase Agreement. In addition, section 2.12 of the Purchase Agreement prohibits the assignment of contracts that are nonassignable by its terms or in law. By the terms of the insurance contract, the subject policies cannot be assigned without defendant's consent. We must determine whether the policies' antiassignment clause is valid and enforceable. To do so, we must determine which law governs the subject policies themselves, which we have determined to be the laws of the state of Maryland.

¶ 50    We are instructed by the appellate court in *Maremont Corp. v. Cheshire*, 288 Ill. App. 3d 721, 726 (1997), which held that "third parties cannot take advantage of the choice of law provisions in contracts they did not sign." In that case, a landowner sued the plaintiff for property damage. Plaintiff notified the insurance carriers of the suit, which declined to defend. The landowner then entered into a settlement agreement with plaintiff that included a choice of law provision that identified South Carolina as the proper forum. The defendant insurance companies were not parties to the settlement agreement. Plaintiff later filed an action against defendants for breach of contract because they did not defend or indemnify plaintiff in the suit brought by the landowner. At trial, the court faced the issue of which state law governed the insurance policies. The trial court agreed with defendants that South Carolina law applied because it was the forum chosen by plaintiff in the settlement agreement. On appeal, the appellate court reversed, citing precedent that a third party may not adopt a choice of law provision in a contract that it did not sign. *Maremont Corp.*, 288 Ill. App. 3d at 726 (citing *Jakubik v. Jakubik*, 208 Ill. App. 3d 119, 122 (1991)). The

-14-

appellate court reasoned that the choice of law provided in the settlement agreement was intended for the benefit of plaintiff and the landowner. *Maremont Corp.*, 288 Ill. App. 3d at 727. After conducting the conflict of laws analysis set forth in *Hofeld*, 59 Ill. 2d at 528, the appellate court reversed, finding that Illinois law applied. *Maremont Corp.*, 288 Ill. App. 3d at 727.

¶ 51    In the instant case, defendant similarly attempts to apply a choice of law provision in a contract to which it was not a party. Though section 2.12 of the Purchase Agreement contains language regarding nonassignability of contracts, the antiassignment clause in the policies themselves is the issue in the instant case. Thus, we decline to adopt the choice of law provision in the Purchase Agreement when determining whether the policies' antiassignment clause is valid and enforceable. Additionally, we will look at whether the subject policies even provide coverage for an EPA investigation process, an issue that is wholly separate from the antiassignment provision of the Purchase Agreement.

¶ 52    After considering the *Hofeld* factors conflict of law analysis, Maryland law governs the subject policies because it has the most significant contacts to the policies. We decline to apply the Purchase Agreement's choice of law provision because we must look to the law that governs the policies themselves when interpreting their provisions, not the agreement that the insurance company was not a party to. Also, *Maremont Corp.* holds that a third party may not take advantage of a choice of law provision that it did not sign. *Maremont Corp.*, 288 Ill. App. 3d at 726.

¶ 53                                    IV. Antiassignment Clause

¶ 54    Having found that Maryland law governs the subject policies, we next determine whether the antiassignment clause was valid and enforceable. Plaintiff admits that the subject policies contain an antiassignment clause that states that the policies may not be assigned without defendant's consent. However, plaintiff argues that this provision is not valid and enforceable under Illinois law, citing *Illinois Tool Works, Inc. v. Commerce & Industry Insurance Co.*, 2011 IL App (1st) 093084, as support. Defendant argues that *Illinois Tool Works Inc.* is distinguishable and cites *Henkel Corp. v. Hartford Accident & Indemnity Co.*, 62 P.3d 69 (Cal. 2003), in support of its claim that the antiassignment clause is a valid and enforceable provision that requires defendant's consent for the policies to be assigned. Neither party cited Maryland law in its arguments on the assignment issue.

¶ 55    It has been well established under Maryland law that an antiassignment clause is valid and enforceable. "[A]nti-assignment clauses have been held valid by Maryland courts." *Handex of Maryland, Inc. v. Waste Mgmt. Disposal Services of Maryland, Inc.*, 458 F. Supp. 2d 266, 271 (D. Md. 2006). See *Della Ratta v. Larkin*, 856 A.2d 643 (Md. 2004) (holding that purported assignment in violation of antiassignment provision of partnership agreement was invalid and unenforceable); *Public Service Comm'n v. Panda-Brandywine, L.P.*, 825 A.2d 462 (Md. 2003) (holding that resell agreement was an assignment in contravention of an antiassignment provision and therefore invalid and unenforceable); *Dwayne Clay, M.D.,*

*P.C. v. Government Employees Insurance Co.*, 739 A.2d 5 (Md. 1999) (affirming judgment for insurer and against purported assignee of insured where insurance policy provided that assignment of interest under policy without insurer's consent would not bind insurer).

¶ 56    Maryland courts have further held that "[a]ny clause in an insurance contract restricting liability or coverage will be held enforceable unless contrary to 'the public policy of this State, as set forth in *** the Insurance Code' or another statute." *Columbia Town Center Title Co. v. 100 Investment Ltd. Partnership*, 36 A.3d 985, 1007 (Md. Ct. Spec. App. 2012) (quoting *Guardian Life Insurance Co. of America v. Insurance Commissioner*, 446 A.2d 1140, 1147 (Md. 1982)). We are not aware of any provision in the insurance code of Maryland that would invalidate the antiassignment clause in the subject policies. Also, Maryland has previously upheld a nonassignability clause in spite of an argument that it was against public policy. In *Dwayne Clay, M.D., P.C. v. Government Employees Insurance Co.*, 739 A.2d 5, 8 (Md. 1999), the Maryland appellate court upheld an antiassignment clause in an automobile insurance policy as not contrary to public policy and enforceable against a physician for his care and treatment of the insured in return for an assignment of uninsured motorist benefits. *Dwayne Clay, M.D., P.C.*, 739 A.2d at 8. The appellate court reasoned that the nonassignability clause was enforceable because the intended direct beneficiary of uninsured motorist coverage is the accident victim, not health care providers or other creditors of the insured. *Dwayne Clay, M.D., P.C.*, 739 A.2d at 8.

¶ 57    In the instant case, the appellate record does not indicate defendant's reasoning behind the inclusion of the antiassignment clause in its policy. The language could have been included in the policies to prevent the insurance company from receiving claims from multiple parties or exposing itself to additional risks that it did not foresee when it issued its policies. Like the insurance company in *Dwayne Clay*, defendant in the instant case likely had valid reasons for including the clause to protect its own interests. *Dwayne Clay, M.D., P.C.*, 739 A.2d at 8. Also, plaintiff has not made an argument that the antiassignment clause is contrary to public policy. The antiassignment clause in the policies at issue here is similar to other such clauses that have been upheld by Maryland courts in the cases previously cited.

¶ 58    However, we are aware of one type of instance in Maryland where an antiassignment clause was not enforceable. In *Ruberoid Co. v. Glassman Construction Co.*, 234 A.2d 875, 879 (Md. 1967), the assignment of a construction contract was held to be valid in spite of the contract's antiassignment clause. In that case, a general contractor subcontracted for floor work on a school project with a sole proprietorship, which subsequently incorporated its business. *Ruberoid Co.*, 234 A.2d at 876. The Maryland appellate court held that the newly incorporated business became the subcontractor of the general contractor by virtue of an equitable assignment even though the subcontract contained an antiassignment clause. *Ruberoid Co.*, 234 A.2d at 879. The appellate court found that the general contractor included the antiassignment clause as assurance that a competent subcontractor would perform the work. *Ruberoid Co.*, 234 A.2d at 879. The fact that the sole proprietor incorporated its business did not defeat the general contractor's assurances. *Ruberoid Co.*, 234 A.2d at 879.

¶ 59    In the instant case, PORI International, Inc., was not merely changing the legal status of its business. Rather, it was selling its assets to plaintiff, which is an entirely different corporation. The reasoning in *Ruberoid* was based on the fact that the only thing that had materially changed was the subcontractor's legal status because, subsequent to its incorporation, the subcontractor was still owned and operated by the same individual. *Ruberoid Co.*, 234 A.2d at 879. The instant case is distinguishable from the appellate court's finding of an equitable assignment because PORI International, Inc., was sold to a different entity, rather than merely changing its legal status.

¶ 60    Following the well-established Maryland case law holding that antiassignment clauses are valid and enforceable, we find that the subject policies were not assigned to plaintiff because the defendant did not provide its written consent. The antiassignment clause also does not violate the insurance code of Maryland, nor is it in contradiction to its public policy under Maryland law.

¶ 61                              V. Policy Coverage

¶ 62    We will next determine the extent of the coverage provided. Specifically, we will consider whether defendant had a duty to defend plaintiff against the EPA investigation. Defendant first raised this issue in its brief in this appeal, arguing that it had no duty to defend plaintiff in the event that Illinois law applies. Defendant claimed that the PRP letter was not a "suit" that is covered under the subject policies, citing *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520 (1995). Defendant argues that the EPA matter only involved a PRP letter, which is not covered under the policies because it merely informs Siemens of the potential for future liability. However, defendant based its argument on Illinois law and did not address the issue under the laws of any other state. We have already determined that Maryland law governs the policies, so we will not consider the Illinois case law cited by defendant. Plaintiff did not address the coverage issue; however, it characterized the EPA matter as a "claim for third-party damages," language presumably crafted to fit the provisions of the subject policies.

¶ 63    The subject policies contain the following coverage provision under section I of part B: "The company [defendant] will pay on behalf of the insured sums which the insured shall become legally obligated to pay as damages because of *** property damage to which this insurance applies, caused by an occurrence ***." The policies define an "occurrence" as "an accident, including injurious exposure to conditions, which results during the policy period, in *** property damage neither expected nor intended from the standpoint of the insured." "Damages" are described as including "damages for loss of use of property resulting from property damage," and "property damage" is defined as "injury to or destruction of tangible property."

¶ 64    "In order for courts to interpret and determine coverage under insurance policies, the primary principle of construction is to apply the terms of the insurance contract itself." (Internal quotation marks omitted.) *Maryland Casualty Co. v. Hanson*, 902 A.2d 152, 163

-17-

(Md. Ct. Spec. App. 2006). We accord the words in the contract their usual, ordinary, and accepted meaning unless there is an indication that the parties intended to use words in the policy in a technical sense. *Mitchell*, 595 A.2d at 475. A word's ordinary meaning is tested by what meaning a reasonably prudent layperson would attach to the term. *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 488 A.2d 486, 488 (Md. 1985). Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer. *Cheney v. Bell National Life Insurance Co.*, 556 A.2d 1135, 1138 (Md. 1989). Rather, the intention of the parties is to be ascertained from the policy as a whole. *Bausch & Lomb Inc. v. Utica Mutual Insurance Co.*, 625 A.2d 1021, 1031 (Md. 1993). A duty to defend arises when a claim is covered or potentially covered under a policy. *Chang v. Brethren Mutual Insurance Co.*, 897 A.2d 854, 865 (Md. Ct. Spec. App. 2006). Under liability coverage, when the policy contains a duty to defend, an insured may recover fees and expenses incurred not only in defending a claim against it, but also in enforcing the insurer's obligations under the policy. *Chang*, 897 A.2d at 865.

¶ 65 Under Maryland law, it has been held that liability under CERCLA is not liability for "property damage," but rather regulatory liability for response costs. *Industrial Enterprises, Inc. v. Penn America Insurance Co.*, 637 F.3d 481, 484 (4th Cir. 2011); *Bausch & Lomb Inc. v. Utica Mutual Insurance Co.*, 625 A.2d 1021, 1036 (Md. 1993). The costs of obtaining a lawyer for representation during an EPA investigation are not covered under a standard general liability insurance policy because the government is acting as a regulator and not an injured property owner. *Industrial Enterprises, Inc.*, 637 F.3d at 487.

¶ 66 The instant case is similar to *Industrial Enterprises, Inc. v. Penn America Insurance Co.*, 637 F.3d 481 (4th Cir. 2011), which held that an EPA investigation under CERCLA is not covered under the standard form language of a comprehensive general liability policy. In *Industrial Enterprises*, the EPA sent the plaintiff a PRP letter informing it that it may be liable for the contamination of certain landfills that plaintiff and other named respondents polluted. Plaintiff forwarded the PRP letter to defendant insurance company, which had previously issued a comprehensive general liability insurance policy that named plaintiff as an insured. Defendant denied plaintiff's request for a defense, claiming that the policy did not cover the EPA investigation. Plaintiff and the other respondents then entered into an "Administrative Settlement Agreement and Order of Consent" with the EPA. The agreement provided that plaintiff and the other respondents would contribute to a coalition fund that would fund at first an investigation and then implement a solution for a cleanup of the environmental contamination. Plaintiff subsequently filed an action for a declaratory judgment in federal court alleging that the general liability insurance policy covered plaintiff for the costs it expended responding to the EPA and contributing to the coalition fund. On plaintiff's motion for partial summary judgment, the district court found that defendant had a duty to defend because there was a "potentiality" of coverage. The district court held a bench trial on the remaining issues and found that plaintiff's contributions to the coalition fund were not defense costs covered by the policies.

¶ 67 On appeal, the appellate court reversed, finding that plaintiff's liability under CERCLA was regulatory liability for response costs and not liability for "property damage" that is

covered by the insurance policy. *Industrial Enterprises, Inc.*, 637 F.3d at 483. In reaching its decision, the appellate court applied Maryland law, citing *Bausch & Lomb Inc. v. Utica Mutual Insurance Co.*, 625 A.2d 1021 (Md. 1993), as the seminal decision in the area. *Industrial Enterprises, Inc.*, 637 F.3d at 487. The appellate court reasoned that "[a] hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an 'all-risks' policy also covering losses sustained by the policy-holder." (Emphasis omitted.) *Industrial Enterprises, Inc.*, 637 F.3d at 487 (quoting *Bausch & Lomb Inc.*, 625 A.2d at 1033). The appellate court determined that the EPA was not acting under its proprietary interests and was instead acting as a regulator to protect the environment for the public health and welfare. *Industrial Enterprises, Inc.*, 637 F.3d at 487-88. Thus, the appellate court found that the insurance company had no obligations arising from its general liability policy because the policy insured only against the insured's liability for damages to a third party's property. *Industrial Enterprises, Inc.*, 637 F.3d at 488.

¶ 68        The general liability policies at issue in *Industrial Enterprises* and *Bausch & Lomb Inc.* contain similar language to the policies issued to plaintiff in the instant case. In *Industrial Enterprises*, the policy at issue stated:

> " 'The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies.' " (Emphasis omitted.) *Industrial Enterprises, Inc.*, 637 F.3d at 486.

The policy in *Bausch & Lomb Inc.* also stated:

> " 'The company *** will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies ***.' " *Bausch & Lomb Inc.*, 625 A.2d at 1024.

The subject policies in the instant case contain nearly identical language:

> "The company will pay on behalf of the insured sums which the insured shall become legally obligated to pay as damages because of *** property damage to which this insurance applies ***."

In holding that the policy did not cover the EPA matter, the appellate court in *Industrial Enterprises* reasoned:

> "The standard [comprehensive general liability] policy language, which preceded the enactment of CERCLA in 1980, was formulated to address an insured's tort liability for property damage caused to third parties. The scope of that risk was well understood, and there is no evidence to indicate that the broad, indeterminate risks of CERCLA liability somehow became automatically includable in the term 'property damage' upon the enactment of CERCLA, without any change to the policy language." *Industrial Enterprises, Inc.*, 637 F.3d at 489.

Given the similarities between the policy language, we follow the holdings in *Industrial Enterprises* and *Bausch & Lomb* that held that the insurance companies did not have a duty

to defend because its general liability insurance policies did not cover the liability under CERCLA.

¶ 69     A notable distinction between *Industrial Enterprises* and *Bausch & Lomb* is that, in those cases, the insured entered into a consent order with the EPA, while in the instant case, plaintiff did not. However, this does not affect our reasoning because the court in *Industrial Enterprises* found that the insurance company did not have a duty to defend CERCLA liability. As stated, a duty to defend arises when a claim is covered or potentially covered under the policy. *Chang*, 897 A.2d at 865. In the instant case, the PRP letter warns of potential liability. However, that potential liability is regulatory liability under CERCLA and not for third-party property damage. Therefore, defendant did not have a duty to defend because the potential liability threatened by the EPA was not the type of action that was covered by the subject policies.

¶ 70                                    CONCLUSION

¶ 71     For the following reasons, we affirm the trial court's order granting summary judgment in favor of defendant. The subject insurance policies are governed by Maryland law, which holds that an antiassignment clause is a valid and enforceable provision of an insurance contract. The antiassignment clause prohibited the assignment of the subject policies without written consent and defendant never gave its written consent to an assignment of the insurance policies. Additionally, even if the policies were properly assigned to plaintiff, a general liability insurance policy does not cover a regulatory action by the EPA. Therefore, defendant did not have a duty to defend plaintiff because the policies at issue did not cover the EPA investigation process. We need not address defendant's additional arguments regarding plaintiff's corporate history prior to the 1997 asset sale because we have already affirmed the trial court that found in its favor.

¶ 72     Affirmed.